SOVEREIGN CAMP OF WOODMEN OF THE WORLD v. McCULLOCH.
(No. 7701.)

(Court of Civil Appeals of Texas. Dallas. March 3, 1917.)

1. INSURANCE ⟲817(3)—MUTUAL BENEFIT—ACTION—BURDEN OF PROOF.

In an action on a fraternal benefit certificate in which the defense was that the insured committed suicide which rendered the certificate void under its terms, the death of the insured being established, it devolved upon the defendant to show that the insured committed suicide.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1999.]

2. TRIAL ⟲139(1)—QUESTION FOR JURY—EVIDENCE.

Where there is slight testimony, it is the duty of the court to instruct a verdict if its probative force is so weak that it merely raises a suspicion of the existence of the fact sought to be established from which the jury could not reasonably infer the existence of the alleged

fact, and there is no room for ordinary minds to differ as to the conclusion to be drawn from it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341.]

3. INSURANCE ⬤➡817(3) — BENEFIT CERTIFICATE—PRESUMPTIONS—SUICIDE.

In an action on a fraternal benefit certificate there is no presumption that insured committed suicide, but the presumption is that he did not.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1999.]

4. INSURANCE ⬤➡819(4)—BENEFIT INSURANCE—SUFFICIENCY OF EVIDENCE.

In an action on a fraternal benefit certificate evidence *held* to sustain a jury finding that the insured did not commit suicide by drinking carbolic acid.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 2006.]

Appeal from District Court, Ellis County; F. L. Hawkins, Judge.

Action by R. A. McCulloch, guardian of estate of W. G. McCulloch, a minor, against the Sovereign Camp of the Woodmen of the World. Judgment for plaintiff, and defendant appeals. Affirmed.

Flippen, Gresham & Freeman and Walter G. Miller, both of Dallas, and Will Hancock, of Waxahachie, for appellant   G. C. Groce, of Waxahachie, and T. H. Collier, of Ennis, for appellee.

RAINEY, C. J.   This suit was instituted by the appellee, R. A. McCulloch, guardian of the estate of W. G. McCulloch, a minor, by petition filed in the district court of Ellis county, Tex., on June 28, 1911, to recover the sum of $1,500 alleged to be due the minor beneficiary under a fraternal beneficiary certificate of life insurance issued by the appellant, Sovereign Camp of the Woodmen of the World, upon the life of the minor beneficiary's deceased uncle, W. A. McCulloch. The defendant in the court below denied any liability by virtue of the beneficiary certificate, claiming that any and all rights under same had been forfeited by reason of the act of the deceased insured, W. A. McCulloch, in that he committed self-murder and died by his own hand and act by drinking carbolic acid or other poisonous potion and deadly drug with the purpose and intent of committing self-destruction, which act, by reason of the terms stipulated in the application of the insured, the constitution and by-laws of the order, and the certificate itself, voided the certificate and forfeited all rights and benefits of the beneficiary thereunder.

After hearing the testimony the case was submitted to the jury on the sole issue of fact:

"Did W. A. McCulloch commit self-murder, and die by his own hand and act, by drinking carbolic acid, or other poisonous, or deadly drug, with the purpose and intent of committing self-destruction?"

This issue was found by the jury in the negative, and the court entered judgment for plaintiff, from which this appeal is prosecuted.

[1] The first and seventh assignments of error raise the question of the sufficiency of the evidence to support the finding of the jury and judgment of the court, and that the court should have instructed a verdict for defendant.

The evidence shows that W. A. McCulloch, deceased, at the time of his death was a member of the Woodmen of the World, and held therein a certificate naming W. G. McCulloch, a minor, beneficiary for whom his guardian sues.   The certificate contains a provision as follows:

"I agree that in the event of my death by my own hand or act, whether I am at the time sane or insane, my beneficiary certificate in said order shall be null and void and of no effect, and all rights and benefits which may have accrued on account thereof shall be absolutely forfeited."

In order to obtain the right to open and conclude in the introduction of evidence and in argument, the defendant below admitted plaintiff's cause of action except as it might be defeated by the special matters pleaded, and the cause was submitted to a jury upon the sole issue of fact:

"Did W. A. McCulloch commit self-murder, and die by his own hand and act, by drinking carbolic acid, or other poisonous potion, or deadly drug, with the purpose and intent of committing self-destruction?"

—which was found by the jury in the negative.   The death of W. A. McCulloch being established, it devolved upon appellant to show that the same was committed by his own hands with intent of committing self-destruction.

The evidence shows that W. A. McCulloch was a member of a railroad bridge gang that at the time of his death occupied some box cars on a siding of the Houston & Texas Central Railroad near Ft. Worth.   On the day of his death he started to work, but left the work about 9 o'clock that morning without saying anything.   About 2 o'clock p. m. he told the cook (Dan Walton) he wanted something to eat, but did not know what he wanted, and the cook made him a bowl of tomato soup, all of which he ate, saying it was the best soup he ever ate.   About 4 o'clock p. m. he asked the cook to get him some oysters.   The cook got two dozen, some crackers, butter, onions, Irish potatoes, and sweet milk, and made him a stew, which he ate about 4:30 or 5:00 o'clock p. m. in the car.   The cook saw him alive almost an hour after this.   This, so far as the record shows, was the last time he was seen alive. About 9 o'clock that evening defendant's witness Adecks returned to the car and found McCulloch sitting on the edge of his bed in his underclothes dead.   There was vomit on the floor from the mouth of the

deceased which smelled of carbolic acid, as did a cup on a stove about four feet from the deceased. This witness thought he was the first person who found McCulloch after his death. Either one or both of his hands were hanging down and the bed and its coverings were in order. His recollection was that the outside doors and windows of the car were closed, and he thought it was fairly cold weather. This witness, as well as witnesses Mabin, Vaughn, Casey, and Loggins, all of whom were at the car that night, testify to a strong odor of carbolic acid in the car and in a cup that was on the stove. The witness Mabin, who, as the coroner, was called and went to the car about 10 o'clock p. m., says he found the deceased sitting on the edge of his cot, with his head and body hanging over. He laid the body down, prized the mouth open with a spoon, and says the tongue and mouth were pretty badly burned on the inside, and there were burns on the outside of the mouth, all the witnesses thought, from carbolic acid. The witness said there was blisters down each side at the corners of his mouth. He knew there was on one side, and he was pretty sure there was on both. His examination was by the light of lanterns held by the roadmen. The witness was 66 years of age. The witness Loggins also testified to what he thought were carbolic acid burns in the mouth, on the lips, and about a quarter of an inch on the outside of the lips and in the corners, and he smelled carbolic acid in the car "awfully strong." The witness Vaughn, who embalmed the body, stated that "there were carbolic acid stains on his lips." He used regular embalming fluid. He didn't know all of its elements, but knew that it contained formaldehyde and glycerine. A carbolic acid burn will at first make the mouth turn red, and after death the mouth will get dark. The witnesses Adecks and Casey, while both in the car at the time of Mabin's examination, neither saw any carbolic acid burns on the body. Adecks says:

"The position in which I was standing did not permit me to see whether or not the mouth was burned."

Casey said:

"I might have seen his mouth if I had tried very hard, but I didn't make any effort. There was a dim light there."

He thought there was a light in the car when he entered it. There was a common wall lamp in the car that night. He did not remember if the chimney was smoked. The witness Adecks further testified that a day or two after McCulloch's death he and Dan Walton, the negro cook, found a bottle outside the car about 30 feet from the rear door. The label on this bottle had been scratched off, but enough of it remained to show it had contained carbolic acid, of which it smelled. This bottle was kept in the car for several days until R. H. McCulloch, brother of W. A. McCulloch, came and took it away. There was testimony from other sources tending to support the theory of suicide, but, as the jury found against said theory, we will state the testimony adduced by appellee to refute appellant's contention.

Dan Walton, cook, testified that, when he first saw McCulloch after his death, he was sitting up on the side of the bed, had one sock off, and had his thumb in the other sock as if pulling it off. They used old cross-ties for kindling wood. He did not know whether such wood ever had creosote on it or not, nor did he remember whether there was any kindling wood in the room in which McCulloch died. Lumber treated with creosote has a strong odor. Witness and Robert McCulloch, appellee, and brother of the deceased, the morning after his death, searched the car and the ground near it, looking for a bottle which had contained anything that might have caused deceased's death, but found none after careful search. Mr. McCulloch found a bottle under the bed which contained medicine that witness had seen W. A. McCulloch use. This witness was told by Adecks that McCulloch was dead, and went to the car with him. He smelled an odor when he went into the car, but did not know what it was. There was a cup on the stove, and it had an odor, but he did not know what it was. If there was any liquid in the cup, he did not see it. There was fluid on the floor which he thought had come from deceased's mouth. He had seen creosoted timber used in the work of the gang, but did not know whether they were using it then or not. They used a coal stove, and old ties, etc., to start fires. He was present when Justice Mabin made an examination of the body. He did not see the inside of the mouth, but did see the outside, and lips, and there was nothing wrong with them so far as he could tell. They did not look like they were burned. On the day following McCulloch's death Adecks and witness hunted all around the car for a bottle, but found none. A few days later Adecks showed him a bottle which he said he had found. The label was off this bottle, but it was empty and smelled like carbolic acid.

Dr. Hooper, after qualifying as a physician, testified that he understood the medicinal properties of carbolic acid and its effects when it comes in contact with human flesh; that it is manufactured from coal tar, creosote, and other substances. When applied to human tissue it colors the tissue a light gray, crisps it, and gives it the appearance of burnt leather. Carbolic acid is given in small quantities to prevent vomiting. If one should swallow half an ounce of carbolic acid, it would burn the mucous membrane or alimentary canal to a crisp, devitalize the tissue, destroy all normal functions of the stomach, and produce death. An overdose of carbolic acid would, he thought, produce nausea, but not vomiting. Apomorphine is the most powerful emetic known to the medical

profession, and he had given it in double dozes to a patient who had taken carbolic acid without producing vomiting. The patient could not vomit because of the paralyzed condition of the stomach. On a dead person a carbolic acid burn will remain permanently because of the morbid condition of the flesh. Carbolic acid and creosote odor are similar to inexperienced persons. If creosote timber is deposited in a small room, there would be an odor of creosote which to some persons would be similar to the odor of carbolic acid. If carbolic acid should come in contact with the lips where death is produced, the appearance would be that of an acid burn, and would remain until the tissues were destroyed by decay, and would be discernible so long as any of the tissue remained. In his opinion, embalming would not destroy the odor of carbolic acid, because the formaldehyde solution would go into the arteries and cavities, and would not come in contact with the burned area; besides, the odor of carbolic acid can hardly be destroyed by formaldehyde. He had put just one drop of carbolic acid in an ounce of formaldehyde and let it set, well-corked, for six months and the odor of the acid was not destroyed. The body of a person killed by carbolic acid will emit an odor so long as the body remained. In his opinion, there was no difference in the odor of carbolic acid manufactured from creosote and crude creosote. Two or three drops of carbolic acid intermingled with water will produce a discernible odor in the room. He treated W. A. McCulloch for tonsilitis and malaria a few months prior to his death, and prescribed a gargle which contained about five drops of carbolic acid to a three-ounce mixture. There was not in this gargle sufficient carbolic acid to produce death. He had treated several persons who had swallowed carbolic acid, had examined the bodies of a few persons who had died from carbolic acid, and his answers were based on personal experience, knowledge, and medical work. He thought if there were carbolic acid burns on a face or lips they would remain, and necessarily be present longer than 12 to 24 hours, and be easily discerned under the glass of a coffin.

S. P. Spalding, an embalmer who had embalmed persons supposed to have been killed by carbolic acid, testified that carbolic acid burns usually leave a black place. It sears the flesh, and after some time it turns dark. He did not think embalming would remove such burns, if it had been any length of time. Possibly it might have been removed before it was there long enough to sear— to have gotten hard.

Dr. McCall, after qualifying as a physician, testified that when carbolic acid comes in contact with human flesh it turns the tissue white. He had seen several persons who died from carbolic acid when it was no trouble to see marks of burns about the mouth and lips, even without a close examination. The burn will remain until decomposition sets in. When carbolic acid comes in contact with tissues it has a paralyzing effect and destroys sensation. There is no circulation of blood through the burned portion of the flesh, and a man who took enough carbolic acid to produce death cannot vomit, because it would paralyze the nerves of the stomach. He had not seen one vomit, and had had several cases; had been present when physicians had tried to make one who had taken carbolic acid vomit. They gave apomorphine, the most powerful emetic, without results. Carbolic acid in small doses is good to prevent vomiting. He had seen persons die from the effects of carbolic acid, and all he had seen thus die endured great suffering and writhed in agony. He did not think a man who had taken carbolic acid would die sitting up, on account of the pain and agony that he would have undergone. If McCulloch had taken carbolic acid he thought the odor would have remained about the body and the coffin for several days.

The first person to see the body of W. A. McCulloch except the justice of the peace, the railroad men, and the undertaker, was J. C. Harris, who had married his sister, and was then living in Ft. Worth. He testified that some one had telephoned him that McCulloch was dead and had taken carbolic acid; that he went to the undertakers about 1 o'clock that night, and found the body in a cooling room with nothing but a sheet spread over it; that electric lights were turned on so as to make it as bright as day, and he looked good for indications of carbolic acid, and found none; that there were no burns on him at all that he could see, and he examined closely. He could not see anything on the mouth, lips, or corners of the mouth, and did not detect the odor of carbolic acid, though he put his nose down and smelled to see if he could smell it. This witness was 57 years old, his eyesight was good, but he had on his glasses when he looked at the body. He did not open the mouth, but kind of pulled the lips down, and they looked natural and did not look fiery red or white. He did not open his teeth and did not see his tongue. He put his head down to the dead man's face, he thought within an inch or half an inch or something like that, to see if he could smell carbolic acid. He did not believe that the man had taken carbolic acid, because his mother had died with heart failure, and the witness believed that McCulloch had died the same way. The witness' wife was the same way, had heart trouble, and came near dying several times. Her mother (McCulloch's mother also) went upstairs before dinner and died suddenly.

R. A. McCulloch, appellee, and brother of W. A. McCulloch, on the night of November 18, 1910, got a telegram from Mr. Casey that his brother was dead, and left on the next

morning train for Ft. Worth to return with the remains. His train was late, and he did not get to Ft. Worth in time to make the train bringing the remains. When he got to Ft. Worth he went to the car where his brother had died, got the negro cook, and as soon as possible they got into the car. There was a wall lamp, or bracket lamp, hanging on the wall. The chimney was very badly smoked. There was some kindling right close to the stove. It was pine, and had been treated with creosote. He thought the kindling was mixed; some of it maybe did not have creosote, but some of it did. It looked like a little armful. He thought there was quite a similarity between the odor of wood treated with creosote and carbolic acid. He found a bottle under the head of the bed. It contained liquid. He had seen this bottle before at the H. & T. C. Hospital. This bottle had "H. & T. C. Hospital" and then "Mouth Wash" printed on it. He (W. A. McCulloch) got this from the nurse at the H. & T. C. Hospital. He later took it with him to Ft. Worth. He had two bottles. They were, witness thought, the same or about the same in size and contained the same medicine— mouth wash, used for gargling the throat. Witness was present at his own house when W. A. McCulloch used this medicine while in bed in his room. Witness' wife was also there. It produced an odor of carbolic acid. The bottle he found at Ft. Worth was hardly half full. He took it home with him and gave it to his wife, and subsequently gave it to Mr. Oren Carter, one of the witnesses in the case. Mr. Adecks gave him another bottle after his brother's death. It looked like the other bottle his brother had taken from his residence to Ft. Worth. He thought it was the same size as the other bottle. It was a larger size bottle than one Mr. Casey mentioned in his testimony. He was not sure what became of the bottle Mr. Adecks turned over to him. His best recollection was that he had left it at his attorney's office, and he had tried to find it and bring it to court, had looked everywhere, and really thought the bottle was at his home until he went to look for it. It had been nearly five years since Mr. Adecks delivered that bottle to him. After his brother's remains were brought home he looked at his face to find burns on it or on his lips, and later in the night made another examination. His first examination was at night by a fairly good lamp, after that he noticed him several times the next morning before the funeral. There were not any burned spots or discolorations on his face. The room was fairly well lighted, having five windows. The day of the funeral was a sunshiny day. There was no odor of carbolic acid coming from the body or the coffin. The witness, in going to Ft. Worth, passed the train going to Ennis with the remains, and Mr. Casey, who was on that train, came

across to his car and told him where the cars were. He went on up to make an investigation as to the cause of his brother's death. The undertaker had phoned him that his brother had committed suicide by drinking carbolic acid, and he also read it in the papers. He went to investigate whether or not the report was true. He did not at that time know that his son was beneficiary of his brother's policy, but thought so. He stayed at the car something like an hour, and came home via Dallas with another brother. The car had an odor in it the next morning. He did not know the difference between creosote and carbolic acid odor. The odor was not so strong, but there was an odor there that could be easily told. The negro cook got the porcelain cup and gave it to him. It had been thrown out west of the car 30 or 40 feet. He took it home with him. He smelled it, and noticed an odor which he thought smelled like creosote, but he did not know the difference. His brother would weaken the mouth wash when he used it. It was at least two months from the time his brother suffered with tonsilitis at his house to the time of his death. He knew that his brother took those two bottles with him when he went back to Ft. Worth two months before he was found dead, but he never saw him with the bottles afterwards, though he was frequently at his house, and was there on Tuesday night before he died on Friday night. When Adecks gave him the second bottle he told him that he had found it 20 or 30 feet west of the car. This was something like two or three weeks after his brother died. When he went to Ft. Worth that morning there was a fluid on the floor of the car from which there was an odor, but he did not pay any attention to the odor, and did not see any oysters or substance in the fluid. There was a gauze on the face of the casket the first time that night that he looked at his brother. There was a glass slipped over it. "It was pushed back when I saw him in the morning." He did not prize open the mouth to examine his tongue or the back of his mouth, but "along in the night when I looked at him, his mouth had parted, and his teeth set ajar just a little bit, and his chin kind of dropped," and at that time another brother, another gentleman, and himself went into the room, and "we looked at him," and he did not see any burns on his lips. There was a lamp just opposite the coffin on a magazine stand, higher than the coffin, but there were no electric lights in the room.

The wife of R. A. McCulloch, and sister-in-law of deceased, testified that deceased was in the railroad hospital at Ennis, of which Dr. Hooper was surgeon in charge. Deceased was there four or five days taking medicine; was using a "mouth wash" and other things. This was about September 1st, before he died. When deceased left the hos-

pital, he took two bottles of the "mouth wash" with carbolic acid in it with him, and used it while he was at her house. When he left there for Ft. Worth, about October 1st, he took with him both bottles, one full and the other about half full, said bottles being in size three ounces. After deceased's body was returned for burial both the bottles were brought, one by her husband and the other by one Adecks, which she recognized as the bottles taken away from her house by the deceased. She compared the bottles by putting them together. They were just alike. One had a label "Mouth Wash" on it; the other did not. It had been scratched off, but by whom she did not know. When the body was returned for burial, having heard he had committed suicide from taking carbolic acid, she examined the face to see if there were any signs of burns on his mouth or face, but found none. The jaw was dropped down a little so the lower teeth and gums could be seen, and there were no burns that she could see at all. She knew the odor of carbolic acid, but did not detect any coming from the coffin. Several other witnesses, relatives of the deceased, testified about as Mrs. McCulloch as to burns and odor of carbolic acid. Dr. W. T. McCall, who attended W. A. McCulloch's funeral and saw the body on that day, as he walked around the coffin the last time noticed pretty carefully through the covering—did not know whether it was a glass or gauze covering—to see if he could see any scars or marks or burns about the mouth or lips, but he did not see any. He looked as carefully as he could in passing slowly around, did not stop, but only viewed the body as he passed, and did not smell carbolic acid in or about the coffin. J. O. Carter, justice of the peace at Ennis, attended W. A. McCulloch's funeral after hearing that he had taken carbolic acid, and looked as carefully as he could, under the circumstances, for burns and saw none. The body was in a casket with either a glass or gauze over the face, but the face was fairly plain in that room. As a notary public, he took the deposition of Mrs. Bell Seymour and attached a bottle to her deposition and delivered it to the district clerk, according to his recollection. The bottle had some fluid in it at the time, but did not know whether it had carbolic acid in it or not, as he did not smell it. He had known W. A. McCulloch very well during his lifetime, and went to the home on Sunday morning. He got down as close as he could over the coffin to see whether or not he could see any evidence of a burn. It was a matter of curiosity on his part. Mrs. B. Gatewood, Mrs. Eliza Carter, Mrs. R. G. Fort, all of whom attended the funeral of W. A. McCulloch, testified to looking carefully at his face and mouth for evidence of carbolic acid burns, and that they saw none.

We have copied copiously from the state-ment of the evidence in appellee's brief, which gives substantially the evidence adduced on the trial.

[2] The question is whether or not the evidence adduced by appellee was of such probative force as to require the judge to submit the cause of death to the jury, or did it in legal contemplation fall short of "any evidence"? Where there is slight testimony it is the duty of the court to instruct a verdict, if its probative force be so weak as merely raises a surmise or suspicion of the existence of the fact sought to be established, from which the jury could not "reasonably infer the existence of the alleged fact," and that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

[3] This is a different character of case, and we think the evidence such that reasonable minds might differ as to the probative force that should be given to the evidence adduced by appellee. It is true that there was evidence adduced by appellant, if not contradicted, that would have warranted an instruction for it, had there been no evidence for appellee. No witness saw deceased take carbolic acid. They saw him dead and the cause of death can only be determined by circumstances. There is no presumption of law that he committed suicide, but the presumption is that he did not. W. O. W. v. Valentine, 173 Ky. 182, 190 S. W. 713.

[4] The testimony of some of the witnesses that carbolic acid when taken in the stomach would paralyze it so that vomiting was impossible, and that the odor of it would remain in the body until it was decomposed, and the other circumstances testified to by appellee's witnesses were such as to raise more than a mere suspicion that death was not caused from carbolic acid required its submission to the jury. The jury having passed on the evidence, and there being sufficient to warrant their finding, we hold that there is no reversible error in the court's ruling.

We have duly considered all of the assignments of error which relate to the admission of testimony, in which we find no reversible error, and the same are overruled.

The judgment is affirmed.