## Sovereign Camp of the Woodmen of the World v. Valentine.

(Decided January 12, 1917.)

### Appeal from Fulton Circuit Court.

1. Insurance—Life Insurance—Suicide—Burden of Proof.—In an action upon an insurance policy where it is contended by appellant that insured committed suicide by drinking carbolic acid, held, that appellee made out a prima facie case when she proved the death of insured, and the burden of proving whether insured died by his own hand, whether sane or insane, was upon the appellant.

2. Appeal and Error—When Verdict Will Not be Disturbed.—The jury is the best judge of the facts, and where there is evidence sufficient to support the verdict, and no error appearing in the record, the verdict will not be disturbed.

3. Appeal and Error—Instructions.—Where appellant offers an instruction similar to the one given by the court, it is in no position to complain that the court did not give it.

HERSCHEL T. SMITH for appellant.

ED. THOMAS and GUS THOMAS for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

This action was instituted in the Fulton Circuit Court by Mary B. Valentine against appellant society to recover on a benefit certificate or policy of insurance for $1,000.00 issued by appellant to one, T. O. Valentine, in 1910, and in which policy the plaintiff, Mary B. Valentine, is the beneficiary. Mary B. Valentine was the wife of T. O. Valentine, who died August 17th, 1914. The benefit certificate contained what is commonly called a suicide clause which reads as follows:

"Section 4. If the member holding this certificate should die . . . . by his own hand or act, whether sane or insane; . . . . this certificate shall be null and void, and of no effect, and all moneys which shall have been paid, and all rights and benefits which have accrued on account of this certificate shall be absolutely forfeited without notice or service."

The appellant society admits the issual of the policy but denies its liability thereon because it charges that T. O. Valentine, the insured, died by his own hand by taking carbolic acid, and that under the clause of the policy above referred to and some parts of its constitution and by-laws, in such case, it is not liable.

To this the plaintiff replied and traversed the allegations that insured took carbolic acid, and affirmatively alleged that if he did so do, that it was by mistake or accident, and not with suicidal intent, and in a third paragraph she further alleged that if the insured did take carbolic acid, not by accident or mistake, then he took it at a time when he was insane to such an extent that he did not know the probable effects thereof and that therefore she was entitled to recover on the policy.

T. O. Valentine, the insured, was a brick mason by trade and was earning at the time of his death about $5.00 per day at a job at which he had been engaged for some weeks at Union City, Tennessee; he came home on Saturday night from work, his partner with him; they had agreed to return to work on Monday morning, but for some slight reason they changed their plans and agreed to return on the afternoon train; they were both about the streets of Fulton on the forenoon of Monday, the day of the death of Valentine; Valentine had another policy of insurance upon which the premiums were paid monthly, and they were due on that

day, and the agent approached Valentine and the premium was paid that forenoon; Valentine was in the Owl drug store about 11 o'clock and called for some carbolic acid, stating to the druggist that he had a horse that had been cut by a barbed wire and he intended to use a solution of carbolic acid in treating the wound, and after some conversation between him and the druggist, he procured an ounce of carbolic acid, and likewise an ounce of iodine which the druggist suggested was also good for such an injury; Mary B. Valentine kept carbolic acid for sanitary purposes in the kitchen; Valentine then left the drug store and went on the outside and had some conversation with the insurance man, and then went away; shortly after this the druggist on his way to dinner passed Valentine at the railroad crossing in conversation with a colored man, in which conversation Valentine inquired of the man if he had pasture for his horse, and the colored man answered that he did not have such pasture. Valentine had shortly before that owned a horse, but it is not shown that he owned one at this time. Between 12:30 and 1 o'clock while the plaintiff, Mary B. Valentine, and her two brothers were sitting at the dining table in the home of the insured, Valentine came in and one of his brothers-in-law said to him, "You are too late for dinner," to which Valentine answered "No, not much," and sat down at the dinner table, and some other conversation followed.

Immediately Valentine arose and went into another room, some of the witnesses thought the kitchen, and while he was out the other three persons left the dining room and went into the sitting room. In a few moments Valentine returned; coming into the sitting room, he exclaimed "I am gone," and sank to the floor; to those who inquired what was the matter, he made no answer, but directed his brother-in-law to get whiskey from the cellar, and his brother-in-law went to the cellar, but not finding the liquor came back for further directions, and Valentine told him to look under the tub, and he returned and brought the whiskey and Valentine drank freely, consuming most of the contents of the bottle. Whiskey is shown to be an antidote for carbolic acid poison. Dr. Nat Morris was called and attempted to administer to Valentine, but without results, and shortly thereafter he died. What became

of the carbolic acid is not shown by the evidence; whether Valentine drank it is not certain from the evidence, although one or two witnesses testified that they smelt carbolic acid when they were near Valentine about the time he died, and evidence was also given that one corner of the mouth of Valentine was white from the burn caused by carbolic acid, but this was the mere conjecture of the witnesses. One or two witnesses mentioned seeing a bottle in the hand of Dr. Nat Morris while he was over the deceased, which they thought was perhaps a bottle containing carbolic acid. No one saw Valentine drink carbolic acid or otherwise do violence to himself. Dr. Morris died before the trial of the case and did not testify. Several witnesses testified that Valentine, on the day of his death, acted and talked in the usual manner and there is no evidence that he was despondent or in any trouble.

From the evidence it cannot be said that the insured died by his own hand or act. It certainly cannot be said that he was insane. Neither can it be said from the evidence that his death resulted from drinking carbolic acid, or, if he did drink carbolic acid, it was intentional or only accidental. The jury heard the facts and found for the plaintiff, Mary B. Valentine. It has often been held that the jury is the judge of the facts, and where there is evidence sufficient to support the verdict, no error appearing in the record, the judgment will be affirmed.

The plaintiff made out a prima facie case when she proved that her husband was dead, because the general clause in the policy is a promise to pay upon the death of the insured and the exception to this is set out in a subsequent and separate clause, and it devolved upon the appellant to show that it came within the exception.

Aetna Life Insurance Co. v. Rustin, 151 Ky. 103; Vicars v. Aetna Life Insurance Co., 158 Ky. 1.

There is no presumption of law that one has committed suicide, but the presumption is that one will not do so, and the burden of proving that the insured died by his own hand or act, whether sane or insane, was upon the society, and, it having failed to show how insured came to his death, the jury was justified in returning a verdict for the plaintiff on the contract of insurance. In the case of the Aetna Life Insurance Company v. Rustin, *supra,* where the insured was found on his

porch shot in the abdomen, from which he died, and where a policy of insurance containing a suicide clause was involved, the court said:

"The plaintiff here made out a *prima facie* case when she showed that her husband had been shot, for the presumption against suicide was strengthened by the proof that no pistol was found about him or about the premises, and the nature of his wound was such that he must have been shot practically where he was found. . . . . As the plaintiff had thus made out her case, it then devolved on the defendant to show that the clause limiting its liability applied. It will be observed that in the general clause of the policy containing the defendant's promise to pay, there is no qualifications or exceptions, and no reference to the subsequent part of the policy containing the limitations on its liability."

All this may well be said of the case at bar. It urges that the instructions given are erroneous, but its chief complaint is that the trial court overruled its motion for a directed verdict in its favor upon the ground as stated in its brief; but there is no proof that insured was insane, or that he took carbolic acid by accident, but that on the contrary the proof shows that he was sane, and that he bought and took the poison with suicidal intent. It further insists, however, that "if the case should have gone to the jury at all, instructions 'H' and 'Y' offered by the defendant should have been given, but I am not relying upon the refusal of the court to give these instructions, but I am hinging the reversal of this case entirely on the refusal of the court to sustain the defendant's motion for peremptory instruction at the conclusion of all of the testimony."

The instructions complained of and which were given by the court are as follows:

"The court instructs the jury to find for the plaintiff the sum of $1,000.00 with interest from Dec. 22nd, 1914, unless they believe that the decedent, T. O. Valentine, voluntarily committed suicide, while sane, as is defined in instruction No. 'C.'

"Instruction 'C.' The court instructs the jury that if they believe from the evidence that the decedent, T. O. Valentine, voluntarily and intentionally, drank carbolic acid at a time when his mind was in sufficiently

sound condition as that he knew the probable conse-quences of the taking of the carbolic acid, if he did so do it at all, with the intention of bringing about or pro-ducing his death, then, in that event, the law is for the defendant and the jury should so find; but on the con-trary the court says to the jury that although they may believe from the evidence that the decedent, T. O. Val-entine, died from the effects of carbolic acid which he had taken, still, if they should further believe from the evidence that said poison was not voluntarily or inten-tionally taken by him for the purpose of committing suicide, but by accident, or mistake, on his part, then and in this latter event, if the jury so believe, the law is for the plaintiff and the jury should so find as di-rected in No. 'B.'

"Instruction No. 2. Although the jury may believe from the evidence that T. O. Valentine was insane at the time he drank the carbolic acid, if he did so, and took his own life, yet the jury should find for the de-fendant unless they should believe from the evidence that at the time he did so he was insane and did not have enough mind to know the act that he was com-mitting would probably result in his death."

From the facts stated we conclude that the case should have been submitted to the jury, and the instruc-tions given by the court fairly and in plain terms sub-mitted the issues raised on the pleadings.

It next complains that instruction "Y" offered by it should have been given. It is as follows:

"The court instructs the jury that if you believe from the evidence that in this case that the death of T. O. Valentine was caused by his voluntarily taking the carbolic acid, a poisonous drug, then you will find for the defendant."

This instruction does not correctly present the law of the case in that it was calculated to mislead the jury. The insured may have taken carbolic acid voluntarily; that is, swallowed it without solicitation or coercion, and yet not have had sufficient mental capacity to know the probable effects thereof, or that it would kill him. Instruction "C," however, given by the court, correctly presents this theory of the case, and it was not error on the part of the trial court to refuse instruction "Y."

Appellant then offered instruction "H," which is as follows:

"The court instructs the jury that if you believe the death of T. O. Valentine was the result of carbolic acid taken by accident and without intention to so take it, if you believe he did take it, then the law is for the plaintiff and you will so find; but, if you believe he took carbolic acid which resulted in his death, knowingly and the taking thereof caused his death, then the law is for the defendant and you will so find."

This instruction in a measure covers one issue presented by the facts, but it is not in such apt terms as instruction "C" given by the court, but which is in substance the same upon this point. Since instruction "C" given by the court presents the issues properly, and fully covers all that is contained in instruction "H," it was not error for the court to refuse to give "H." It has been repeatedly held by this court that even where an offered instruction correctly states the law, and might properly have been given, it is not prejudicial error to refuse it, if the court gave an instruction covering substantially all that it contained.

Tyler v. First National Bank of Winslow, 150 Ky. 515.

And since the appellant offered an instruction similar to the one given by the court, it is in no position to complain that the court erred, even if it did so, which in this case does not appear to be true.

Appellant's motion for a directed verdict having been properly overruled, and the case submitted to the jury upon instructions correctly submitting the issues, it results that the case must be affirmed.