## Voorheis' Administrator v. Chesapeake & Ohio Railway Company, et al.

(Decided June 24, 1927.)

### Appeal from Lewis Circuit Court.

1.  Railroads.—In action against railroad for death of plaintiff's decedent when struck by passenger train on crossing, evidence as

to deceased's contributory negligence held to require directed verdict for defendant.

2. Negligence.—Action for personal injuries may be defeated through contributory negligence on part of injured person, and but for which contributory negligence injury would not have occurred, notwithstanding defendant may also be guilty of negligence.

ALLEN D. COLE and NORMAN W. BOWMAN for appellant.

BROWING & REED for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 11:30 A. M. on May 19, 1924, J. J. Voorheis, who was about 73 years of age, was struck and killed on a crossing in Vanceburg by an east-bound passenger train (No. 6) operated by and on the track of appellee and defendant below, Chesapeake & Ohio Railway Company. Appellant and plaintiff below, Equitable Trust Company, qualified as personal representative of decedent and filed this action in the Lewis circuit court against defendant railroad company and the engineer of the colliding train to recover damages for the destruction of decedent's life, which were named in the petition at the sum of $10,000. The answer denied the alleged negligence and in a second paragraph pleaded contributory negligence of decedent, which, in turn, was denied by reply, thus making the issues. At the close of the evidence the court sustained defendants' motion for a peremptory instruction in their favor, and a verdict was accordingly returned, upon which judgment was rendered dismissing the petition, and, complaining of it, plaintiff prosecutes this appeal.

The railroad track at the place complained of does not appear to run exactly with the points of the compass, but the witnesses described it as running east and west, and the passenger train that collided with decedent was coming from the west and was to his right as he was approaching the track from the north in attempting to cross it to the south. On the north side of the main track at the crossing (assuming it to run east and west as is done by the witnesses) was a side track, and a long freight train was standing on the side track, with the caboose some 20 feet from the east edge of the street, which was so placed as to clear the main track for the passenger train which was then due or about due. It was intended to back the freight train and switch it onto the main

track, it going the same direction as the passenger train, after the latter had passed and which seems to have been known to decedent, who was familiar with that method, and which seems to have been the same as followed regularly theretofore. Two residences were located on the north side of the railroad crossing near the right of way and also to the track. Only six witnesses saw the accident, five of whom were introduced and testified at the trial.

Two of the witnesses were Mrs. Minerva Hickel and Lizzie Hickel, both of whom resided in the west house referred to. Minerva Hickel did not see what transpired just preceding the accident, but saw it momentarily before it did happen. She had been in the kitchen preparing the noon meal, and happened to go to the front door leading on to the front porch, and say the passenger train almost immediately upon the crossing, and the decedent was then attempting to cross the track in front of it, but not until witness had attempted to warn him of the danger. To use her own language, she said:

"When I come out, I hollered for life, but he didn't seem to pay any attention. . . . He was within two feet and a half of the rail; I saw him when he was hit; he was making the last step. . . . He had just started upon the railroad when I began to holler; I thought he was going to make it."

The witness was also asked and answered:

"Q. Did it (the train) blow any whistle or ring any bell? A. I didn't hear it before I come out on the porch."

On cross-examination she was asked and answered with reference to signals:

"Q. Did I understand you to say there was no whistle blown before you came out on the porch? A. I couldn't say.

"Q. You were not paying any attention? A. No, sir; I don't know if there was a whistle blown or a bell rung; I don't know about that.

"Q. You don't know whether it was or not? A. No, sir."

She also stated that the passenger train was running faster than a freight train, but did not attempt to state its approxmiate speed.

The other occupant of that house, Lizzie Hickel, was sitting on the steps, to the front porch, which she says was "pretty close to the crossing," with a Miss Griffith, the latter of whom did not testify in the case. The other house referred to was occupied by Dan Copen, and the testimony of Lizzie Hickel as to what occurred at the time of the accident is thus stated in the transcript:

"Q. Now, where was the old gentleman when you first saw him? A. In front of Copen's house.

"Q. Tell the jury what occurred? A. He come up in front of the Copen house and started upon the west-bound track; I hollered not to start over there; he didn't stop; he just kept coming on.

"Q. Before he got on the track did Mr. Copen stop him? A. Dan Copen stopped him first.

"Q. Did you hear what Dan Copen said to him? A. No, sir.

"Q. Did you hear any part of the conversation? A. No, sir.

"Q. What else took place there? A. He kept coming; I didn't hear what Dan said.

"Q. Did he stop him? A. Yes, sir.

"Q. Then what did he do? A. He stepped along; he didn't listen to Dan Copen.

"Q. Did he look up and down the track? A. Yes; he looked up and down.

"Q. Did you hear the train approaching at that time? A. Yes, sir.

"Q. You could hear it? A. Yes, sir.

"Q. Then he came on toward the track? A. Yes, sir.

"Q. Then what did you do, if anything? A. I yelled at him.

"Q. Where was he when you yelled at him? A. On the west-bound track.

"Q. The track that the freight train was on? A. Yes, sir.

"Q. Did he have to cross that track before he could get on the east-bound track? A. Yes, sir.

"Q. When you hollered at him did he listen? A. Yes, sir; I know he heard me.

"Q. What did he do to indicate that he heard you? A. He looked at me and looked up the road.

"Q. Was this train, No. 6, in your view then? A. Yes, sir."

The witness Copen, who occupied the other house east of the one occupied by the Hickels, was then introduced, and testified that he was sitting on the front porch of his house at the time, and he was then asked and answered:

"Q. Did you hear No. 6 coming? A. I heard it whistle a short distance down the road.

"Q. Where was Mr. Voorheis at that time? A. At the lower end of our yard.

"Q. Did you call out to him? A. I called out; 'Mr. Voorheis, there comes No. 6; you can't make it.' He looked at me and didn't make any answer at all and walked upon the railroad. He looked down the railroad and east; I didn't think he would go on.

"Q. When he looked to the west was No. 6 in sight? A. Yes, sir.

"Q. What track was he on? A. The westbound.

"Q. The track next to the river? A. Yes, sir.

"Q. What else did you say, if anything, to Mr. Voorheis? A. No. sir; the train bell was making a noise—

"Q. Did you hear them calling to Mr. Voorheis, this young lady? A. No.; the bell was ringing.

"Q. Did you see Mr. Voorheis look towards her? A. I do not know whether he looked towards the girl or not.

"The Court: How far is your house from the west-bound track? A. Well, I judge 30 or 40 feet; maybe more."

On cross-examination he said:

"I left the porch when I told Mr. Voorheis No. 6 was coming. . . . I went out on the sidewalk and took him by the arm and told him to go back."

Further along in his testimony he said: "Yes, sir; he stopped a second and then went on; he gave me no answer at all;" and he said that decedent looked at him, as well as down the track in the direction the passenger train was coming. He then stated that the whistle was blown and the bell was ringing. The other two eyewitnesses were members of the crew of the freight train that was standing on the side track east of the crossing, who were in or near the caboose just off the crossing, and they testified, in substance, the same as the

witnesses Lizzie Hickel and Dan Copen, and they also said that whistle signals were given by the passenger train for the crossing and that the bell was ringing. Mrs. O. N. Plummer, who lived 125 feet east of the crossing and south of the railroad track, said that she did not hear any whistle, but was unable to state whether the bell was ringing. The engineer of the passenger train was introduced by plaintiff, and he testified that he was on the lookout and did not see the decedent until about the time he was struck, and that his train was traveling at about 12 miles an hour, and that he gave the whistle signal for the crossing, and the bell was ringing. There were a number of other witnesses who testified as to the giving of signals of the train's approach to the crossing.

It would therefore appear that it is, at least, doubtful whether the other testimony in the case was sufficient to contradict the positive testimony as to the giving of signals, since, as we have seen, the negative testimony relied on for that purpose was in the main qualified by the witness giving it, who said that they were "paying no attention," and some of them stated that the signals might have been given because of the fact that they were not paying attention. We find no proof of excessive speed. Some of the witnesses testified that the passenger train was running "fast," but that description of its speed has but little, if any, probative force on the issue as to its excessive and dangerous speed at the particular place. But, however that may be, we will assume for the purposes of this case, but without determining the point, that the evidence was sufficient to submit the issue of negligence of defendants to the jury.

It is established beyond contradiction that decedent saw the approaching passenger train and after that he endeavored to cross in front of it, notwithstanding he had been warned not to do so, and one witness, Copen, actually endeavored to physically restrain him from attempting to cross the track in front of the train, and which is established not only by that witness, but by Lizzie Hickel also, and no witness contradicted it. It appears to us that in the light of such testimony the court could do nothing else except to direct the verdict that it did, unless the thoroughly established rules of law by this and other courts are to be set aside and held for naught. It is a well-established practice, and which needs no fortification by the citation of opinions, that an action for personal injury of the nature of this one may

be defeated through contributory negligence on the part of the injured person, and but for which contributory negligence the injury would not have occurred, notwithstanding the defendant may also be guilty of negligence; and such contributory negligence is alweys available as a bar to the right of action, unless something appears in the record to legally excuse it, but which is not true in this case. It has been so held by us in a great number of cases under varying facts and circumstances. Two comparatively recent ones involving similar accidents at grade railroad crossings are Barrett's Adm'r v. L. & N. R. Co., 206 Ky. 662, 268 S. W. 283, and L. & N. R. Co v. Taylor's Adm'r, 169 Ky. 435, 184 S. W. 371. Other cases are referred to in our opinions in those two and there is no discordant note in any of them out of harmony with the above statement.

In the Taylor opinion, in disposing of the question, we said:

"In this case, as in the two cases referred to, it is unnecessary to determine whether the company or its agents were guilty of negligence; the undisputed facts and all fair inferences deducible from them show unmistakably that the decedent with the knowledge of the train's approach placed himself in a place of danger, but for which the collision would not have occurred."

In the Barrett opinion the testimony did not so unerringly point to contributory negligence as it does in this case, but the lower court directed a verdict for defendant and which we sustained. After a recitation of the facts, and a reference to a number of prior opinions involving similar facts, we said in that opinion:

"From these cases it is clear that where one knowing of the approach of a train undertakes to cross ahead of it, whether his conduct be mere recklessness upon his part, or whether it be the result of mistaken judgment, there can be no recovery whatever may be the negligence of the defendants or its agents, because his own recklessness or mistaken judgment is the proximate cause of his injury."

The rule, as so announced and so well settled, is applicable to the facts of this case, as appears from the transcript of evidence, and the court properly sustained

the motion for peremptory instruction, even if it should be conceded that there was testimony sufficient to establish negligence on the part of defendants.

We find no merit in the other points discussed in the brief, and the judgment is affirmed.

Whole court sitting, except Judge Sampson, who was absent.