## Louisville & Nashville Railroad Company v. Snow's Administrator.

(Decided June 20, 1930.)

212

HUNT & BUSH, B. L. KESSINGER and MORRIS & JONES for appellant.

LESLIE W. MORRIS and MARION RIDER for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

This appeal is prosecuted to reverse a judgment for $10,000 recovered against the appellant, Louisville & Nashville Railroad Company, the defendant below, by L. L. Snow, administrator of the estate of Clarence Snow, deceased.

Clarence Snow was run over and killed by a freight train upon the Kentucky river bridge of defendant at Frankfort about 10 o'clock p. m. on February 2, 1929. His administrator sued for his death, and in his petition alleged that a footway provided over the bridge for pedestrians by defendant was out of repair and dangerous, and because thereof Snow was killed. In an amended petition he alleged that, prior to the year 1869, the Louisville, Cincinnati & Lexington Railroad Company constructed the bridge mentioned in the petition over the Kentucky river in the city of Frankfort, and in August, 1869, entered into a written contract with the city of Frankfort and Franklin county whereby it gave to the

city and county the privilege of constructing a floor with protecting side rails thereon on its railroad bridge over the Kentucky river at Frankfort, so that the bridge could be used by vehicles and pedestrians; and the city and county were granted the right to operate the bridge as a toll bridge and to collect tolls from the public using it, such tolls not to be in excess of the tolls allowable under the railroad company's charter.

The contract further provided that the Louisville, Cincinnati & Lexington Railroad Company should have the right to terminate the contract at any time by paying to the city of Frankfort and the county of Franklin the amount expended by them in flooring the bridge. It was further alleged that shortly after the execution of this contract the city and county constructed a floor in the bridge, and set aside and established a part of the floor for vehicular traffic and a part as a walkway for pedestrians, and operated the bridge as a toll bridge until June 26, 1882, charging toll, however, only to those of the public who crossed the bridge in vehicles; that the Louisville & Nashville Railroad Company, having acquired the right of the Louisville, Cincinnati & Lexington Railroad Company, exercised the right reserved in the contract to terminate it, and on June 26, 1882, took over and assumed the control and operation of the bridge, after paying the city of Frankfort and the county of Franklin for their interest therein as provided in the contract. It was further alleged that from that date the Louisville & Nashville Railroad Company continuously operated the bridge as a toll bridge, and that, in connection with its operation of the same as a toll bridge, it set aside and dedicated to public use a walkway for foot passengers over the bridge as well as a way for vehicular traffic.

The driveway occupied the space between the steel girders and the corresponding space over the eastern approach to the bridge. The footway was constructed outside the steel girders and along the north side of the eastern approach to the bridge. East of the steel girders a guard rail consisting of timbers about 6 by 8 inches was placed between the driveway and the footway. Along the north side of the footway, which was on the down river side of the bridge, was a handrail. From the north rail of the railroad track in the driveway to the

guard rail was 3.65 feet and from the guard rail to the handrail along the north side of the bridge was 2.2 feet.

In 1928 the railroad company began the construction of a new bridge immediately south of, and parallel to, the old bridge. In August, 1928, the old bridge was closed to all traffic except trains for the installation of machinery and equipment necessary for the construction of a new pier in the Kentucky river. About 100 feet of flooring between the steel girders and the east end of the bridge was removed. A corresponding portion of the guard rail, which separated the driveway and footway, was also removed. After a few days the flooring was restored but the portion of the guard rail that had been removed was not replaced, and, as a result, the end of the remaining section of the guard rail, extending several inches above the floor, was left exposed at a point about 48 feet east of the steel girders. There was an iron bolt through the exposed end of the guard rail which extended slightly above the rail. Vehicular traffic was not again permitted to use the portion of the bridge that had been set aside as a driveway, but, as soon as the flooring was replaced, pedestrians, without objection from the railroad company, began using the footway just as they used it theretofore, and continued so to use it until the accident to Snow in February, 1929.

A large number of people live on the west side of the Kentucky river in what is known as Belle Point, which is within the corporate limits of Frankfort, and the record discloses that from 300 to 600 persons used the footway in question daily. Appellee's intestate lived in Belle Point, and at the time of his death was employed at his father's grocery store in Frankfort on the east side of the river. About 9:30 o'clock on the night of the accident he left his father's store and started to his home in Belle Point; his route leading over the bridge. With him was his fourteen year old son. At the east end of the bridge Snow met J. W. Poe, and a short conversation took place, after which Snow started west across the bridge. Poe was the last witness who saw him alive. About this time an east-bound freight train reached the west end of the bridge. While the train was on the bridge and in motion, employees of the railroad company at each end of the bridge were attracted by the outcry of the boy. After the freight train had passed over the bridge, they found Snow's

mutilated body scattered along the track. Bloodstains were found along the track near the exposed end of the above-described guard rail and extending some distance east. An examination of the train at a station a few miles east of Frankfort disclosed blood on the front truck of the eighteenth car back of the engine and upon the wheels of other cars toward the rear of the train. No blood was found upon the engine or any of the trucks of the first seventeen cars. No one saw the accident, except Snow's son, who was not permitted to testify.

It is appellee's contention that the evidence supports his theory that his intestate stumbled over the exposed end of the guard rail and fell under the train. On the other hand, it is contended by appellant that such a theory is speculative, is not sustained by the evidence, and that no one knows the cause of the accident, if it was an accident.

Appellant insists that the judgment should be reversed for the following reasons:

(1) Plaintiff's petition, as amended, does not state a cause of action, and defendant's demurrer thereto should have been sustained.

(2) Defendant's motion for a peremptory instruction should have been sustained upon three grounds: (a) Decedent was a trespasser, or, at most, a licensee upon defendant's bridge, and defendant violated no duty to him; (b) the evidence does not show decedent's death to have been caused by the obstacle complained of, to-wit, the exposed end of the guard rail; and (c) decedent knew the condition of the bridge, assumed all risk, and was guilty of contributory negligence.

(3) Incompetent and prejudicial evidence was admitted over defendant's objection.

(4) Instruction No. 1, given over defendant's objection, was erroneous.

The first ground is based on the theory that the petition as amended shows that Snow was a trespasser or, at most, a mere licensee, to whom appellant owed no duty except not to injure him by any positive or affirmative act of negligence, and not to expose him to any suddenly created and unexpected danger. Under subdivision (a) of ground 2 it is insisted that the evidence shows that Snow was either a trespasser or a licensee. Counsel for appellant in their brief have argued these

two grounds together, and consequently we will consider them together in this opinion.

If Snow was a trespasser, his administrator cannot recover for his death because the appellant owed him no duty except to exercise ordinary care with all the means at its command to prevent injury to him after his peril was discovered. L. & N. Railroad Co. v. Dooley's Adm'r, 220 Ky. 67, 294 S. W. 810; Howard v. I. C. Railway Co., 189 Ky. 60, 224 S. W. 635. If he was a bare licensee, he took the premises as he found them, and his administrator cannot recover because of the unsafe condition of the footway, since the appellant owed him no duty except to refrain from any positive act of negligence that suddenly created a hazard to him without reasonable notice to him of the changed conditions. Shaver's Adm'r v. Louisville Gas & Electric Co., 207 Ky. 180, 268 S. W. 1082; Sage's Adm'r v. Creech Coal Company, 194 Ky. 415, 240 S. W. 42; Rabe v. C. & O. R. R. Co., 190 Ky. 255, 227 S. W. 166, 16 A. L. R. 1052; Bales v. L. & N. Railroad Company, 179 Ky. 207, 200 S. W. 471. Clearly the deceased was not a trespasser. It is argued that appellant abandoned the use of the bridge both as a toll bridge and as a passway for pedestrians in August, 1928, and closed it to public travel, and that persons who thereafter used it were trespassers. True, tearing out the 100-foot section of the bridge in August, 1928, closed it by necessity temporarily, but the bridge was left in this condition for only a short period of time. Temporary flooring was relaid, and, while the footway was not restored to its former condition, it was put in substantially the same condition, and pedestrians used it thereafter just as they had used it before the interruption caused by the temporary removal of the flooring. Nothing was done by appellant that constituted notice to the public that permission to use the footway had been withdrawn. It is urged in appellant's behalf, however, that, even if it be conceded that Snow was not a trespasser, he was no more than a mere licensee and not an invitee, and therefore the railroad company is not liable.

As pointed out in the cases cited above the owner or occupier of land owes a more limited duty to a mere licensee than he does to an invitee. However, the distinction between a licensee and an invitee is oftentimes shadowy and indistinct. Leonard v. Enterprise Realty Co., 187 Ky. 578, 219 S. W. 1066, 10 A. L. R. 238. The

distinction is generally stated to be that invitation is inferred where there is a common or mutual advantage, while license is inferred where the object is the mere pleasure or benefit of the person using it. Sage's Adm'r v. Creech Coal Company, supra; Southern Ry. Co. v. Goddard, 121 Ky. 567, 89 S. W. 675, 28 Ky. Law Rep. 523, 12 Ann. Cas. 116. The decedent was not an invitee in the technical sense that one going upon the premises of another for their mutual advantage is an invitee, but the facts of this case bring it within the class of cases in which the doctrine has been recognized and applied that, when the owner, by his conduct, has induced a party to use a private way in the belief that it is open for the use of the public the duty is imposed upon him of maintaining the way in a reasonably safe condition. Where one by his conduct has induced the public to use a way in the belief that it is a street or public way, which all have the right to use, and where they suppose they will be safe, his liability should be coextensive with the inducement or implied invitation. Sweeny v. R. R. Co., 10 Allen (Mass.) 368, 87 Am. Dec. 644; Holmes v. Drew, 151 Mass. 578, 25 N. E. 22; Rachmel v. Clark, 205 Pa. 314, 54 A. 1027, 62 L. R. A. 959; B. & O. Southwestern R. Co. v. Slaughter, 167 Ind. 330, 79 N. E. 186, 7 L. R. A. (N. S.) 597, 119 Am. St. Rep. 503; Campbell v. Boyd, 88 N. C. 129, 43 Am. Rep. 740; Weidman v. Consolidated Gas, Electric Light & Power Co. (Md.) 148 A. 270; Nashville, C. & St. L. R. Co. v. Blackwell, 201 Ala. 657, 79 So. 129; Leighton v. Dean, 117 Me. 40, 102 A. 565, L. R. A. 1918B, 922.

In Zetley v. Jame Realty Co., 185 Wis. 205, 201 N. W. 252, 254, the court said: "Where premises adjoining a public way are so connected with the public way as to indicate a public use, an invitation to so use is implied. In such case the owner is bound to use ordinary care to protect users of such way from personal injury by reason of such use." In Printy v. Reimbold, 200 Iowa, 541, 202 N. W. 122, 205 N. W. 211, 212, 41 A. L. R. 1423, the court, although it held that under the facts of the particular case the plaintiff's intestate did not come within the above rule, said in regard to the rule:

"It is conceded that she was not an invitee within the general doctrine that one going upon the premises of another for their mutual advantage is

an invitee, but it is contended that the facts of this case bring it within the class of cases in which the defendant by his conduct has allured or induced a party to use a private way in the belief that it is open for the use of the public, thereby imposing the duty upon him of maintaining the same in a reasonably safe condition. The doctrine, as stated, is familiar, and has been recognized and applied in numerous cases in this state. Ambroz v. Cedar Rapids Electric Light & P. Co., 131 Iowa, 336, 108 N. W. 540; Connell v. Keokuk Electric R. & Power Co., 131 Iowa, 622, 109 N. W. 177; Upp. v. Darner, 150 Iowa, 403, 32 L. R. A. (N. S.) 743, 130 N. W. 409, Ann. Cas. 1912D, 574.''

Here the footway in question had been constructed in the first instance for the use of the public; it had been floored, and a fence or handrail had been constructed along its north edge and a footrail between it and that part of the bridge set apart for vehicular traffic and trains, for the protection of pedestrians. It had been maintained for more than forty years by the appellant for the use of the public. The bridge was an extension of Broadway, one of the main streets of the city of Frankfort, and connected the main part of the city on the north and east side of the Kentucky river and that part of the city on the opposite side of the river known as Belle Point. This case is not one, like many cited in appellant's brief, of mere passive acquiescence by the railroad company in the use of its bridge by the public. Snow was more than a mere licensee. He was using the bridge under circumstances showing an invitation extended or an inducement held out to him as one of the general public. He was using the footway for the very purpose for which it had been constructed, and to which it had been, in effect, dedicated by the owner. It was therefore, the duty of the railroad company, so long as it maintained the footway and until it revoked the permission for the public to use it, to exercise ordinary care to see that it was in a reasonably safe condition. It follows that the petition as amended stated a cause of action, and the evidence authorized a submission to the jury of the question as to whether or not the appellant had negligently failed to keep the walkway in a reasonably safe condition.

It is argued that, even if appellant owed to appellee's intestate the duty of keeping the walkway in a reasonably safe condition, and that it negligently failed to perform that duty, yet appellee failed to establish that such negligence caused his intestate's death, and a number of cases are relied on which hold that, where, under all the evidence, the injury may as reasonably be attributed to some cause independent of the negligence proved for which the defendant would not be responsible as to negligence, the case should not be submitted to the jury, since the cause of the injury is a matter of mere speculation. While negligence is not to be presumed, it may be inferred from proven facts, and the facts here were sufficient to warrant the inference by the jury that Snow's death was caused by stumbling over the exposed end of the guard rail in the darkness and falling under the passing freight train. The proof shows that Snow was seen walking west in the direction of his home along the walkway on the bridge, accompanied by his son, just before he was killed. The majority of the witnesses, who inspected the premises soon after the accident, testified that the first indications of blood on the rail were about opposite the exposed end of the guard rail and extended thence to the east end of the bridge. One witness testified that he discovered a foot between the rails of the railroad track about 20 feet west of the exposed end of the guard rail. The witness who picked up the foot, however, testified that it was lying 7 feet, by actual measurement, west of the end of the guard rail. If Snow stumbled over the guard rail, it is reasonable to assume that he fell west of the point where he stumbled, which was in the direction in which he was traveling.

Probably the strongest case tending to support appellant's contention is Wintuska's Admr. v. L. & N. R. R. Co., 20 S. W. 819, 820, 14 Ky. Law Rep. 579. In that case the deceased was last seen on the top of a box car going in the direction of a flat car in front of it. Before reaching the flat car, it was necessary for him to go down a ladder at the side of the box car, and there was evidence tending to show that one in doing so would be in danger of coming in contact with a ledge of rock. No one saw the manner of his death. He was missed after the train had gone 8 or 10 miles beyond where his body was found. The accident occurred upon a dark, rainy night. Deceased's body was found near the point where the ledge

of rock projected. There was a wound upon the right side of his head, and, as the train was traveling, the ladder and the ledge of rock were on the right side of the train. It was held that there was no evidence tending to show that the accident was caused by deceased's body coming in contact with the projecting ledge of rock, and that a peremptory instruction should have been given. In disposing of the contention that the deceased came in contact with the rock, the court said: "It seems to us, however, that all this is mere speculation. Why not as well suppose that the deceased never came in contact with the ledge, but became dizzy, or stumbled in the darkness, as he walked along the top of the car, and fell off, the wound upon his head being caused by coming in contact with some hard substance as he struck the ground."

In the Wintuska case the deceased was walking on top of a moving box car in the darkness, and the danger of this conduct authorized the conclusion that there was just as much probability that the deceased stumbled in the darkness and fell off the car as that he came in contact with the projecting ledge of rock, which left the cause of his death a matter of speculation.

We think the facts in the instant case distinguish it from the Wintuska case. The exposed end of the guard rail was at a point where the walkway turned to the right, and in the darkness a pedestrian, unless he turned at the proper place, would probably walk into the guard rail. The deceased was on his way home, and was seen walking along the footway just before the accident. The facts eliminate probable causes of the accident, other than the negligence of the defendant, customarily referred to in the opinions in which it has been held that the cause of the accident was left to surmise and speculation. The deceased was sober so far as the record discloses, and was not on the railroad track immediately before the accident. He was on his way home, and there was no occasion for him to attempt to board the train. Under the facts the only possible inference as to the cause of his death, other than the unsafe condition of the walkway, is that he intentionally threw himself under the train. However, the law presumes that one will not commit suicide. Sovereign Camp of the Woodmen of the World v. Valentine, 173 Ky. 182, 190 S. W. 712. The facts were sufficient to authorize the inference that Snow's death was proximately caused by the unsafe con-

dition of the walkway. The deceased had passed over the bridge frequently after the alleged dangerous condition had been created, and, had the accident occurred in the daytime, he might have been guilty of contributory negligence as a matter of law. However, the accident occurred in the darkness, and at the time the danger was not obvious. Furthermore, the exposed end of the guard rail was near the point where the footway veered to the right which rendered it peculiarly dangerous in the nighttime. Under the circumstances, deceased's alleged contributory negligence was a question for the jury. L. & N. R. R. Co. v. Muncey, 229 Ky. 538, 17. S. W. (2d) 422.

It is finally insisted that the court erred in admitting certain evidence over appellant's objection in regard to the so-called contract with the city of Frankfort and the fiscal court of Franklin county and the relation of the railroad company to this contract, and the court also erred in instructing the jury, if they believed from the evidence that the railroad company operated the bridge as a toll bridge, charging toll for vehicular traffic thereover, and, as an incident to such operation, it maintained and provided a walkway or footway for pedestrian traffic over the bridge, inviting the general public to use the footway in connection with the operation of the bridge as a toll bridge, then it was its duty to use ordinary care to keep the walkway in a reasonably safe condition for travelers. It is contended that the evidence admitted over appellant's objection had nothing to do with the case, and was prejudicial, and that it was error to refer in the instructions to the maintenance of a walkway as an incident to the operation of the bridge as a toll bridge. Since we have concluded that, under the facts, the appellant was under the duty to use ordinary care to keep the walkway in a reasonably safe condition, the objections to the evidence and instructions are without merit. In fact, if it was the duty of the railroad company to keep the walkway in a reasonably safe condition, regardless of any connection it may have had with the operation of the bridge as a toll bridge, then not only was the evidence complained of not prejudicial, but instruction No. 1 was more favorable to appellant than the one to which it was entitled. .

The judgment is affirmed.

The whole court sitting.