## Illinois Cent. R. Co. v. Applegate's Adm'x et al.

(Decided June 19, 1936.)

(As Modified on Denial of Rehearing May 25, 1937.)

460

TRABUE, DOOLAN, HELM & HELM, CHARLES N. BURCH, EDMUND F. TRABUE and BLAKELY HELM for appellant.

DODD & DODD for administratrix.

FARNSLEY & FARNSLEY and J. M. HOTTELL for Ohio Valley Loan Co.

CRAWFORD, MIDDLETON, MILNER & SEELBACH for Kosmos Portland Cement Co.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

The Illinois Central Railroad Company appeals from a judgment entered on a verdict of a jury against it in favor of Harry L. Applegate's administratrix.

In an accident at a private crossing in Jefferson county, just north of West Point, an automobile in which Harry L. Applegate was traveling, on October 15, 1934, was struck by a train of the Illinois Central Railroad Company, resulting in his death.

His administratrix, to recover for the loss of his power to earn money, sets forth in her petition as amended numerous specific acts of negligence on the part of the railroad company and its agents and employees in charge of its train of cars. On a trial before a jury, the evidence in her favor and that of the railroad company was directed to the location and situation of the crossing; the conditions surrounding it; the custom of the railroad company to give signals for this crossing; and its giving and failing to give signals on the occasion of the death of Applegate.

The track of the Illinois Central Railway Company paralleled highway 31-W about 50 feet apart. Applegate lived on a farm just south of Kosmosdale, near the railroad track on the east side of the highway. He owned the farm on which his home was located and other land about three-quarters of a mile on the farther side of the railroad, west of the highway. To go

from his residence to this farm, he traveled the highway, then along a private road to a grade crossing. The private road leaves the highway at about right angles and runs about 54 feet from the highway to the railroad track, then about 243 feet to a high bank above the Ohio river. A field lays to the right of this road along the railroad back toward the overhead bridge. One house is located near the river and is reached by going along this field near the river; two others are located to the left of this private road and are reached by using this crossing. Applegate had alfalfa in a field on his farthest farm reached by this private crossing. He had a number of men employed to bale hay. They had been working that morning in a field north of the overhead bridge. The hay baler had been taken over this crossing for use in the afternoon. It was expected of Applegate to bring with him to the field a hayfork, but he forgot it. He went to get it, leaving the men in the field waiting for him. He had been gone approximately ten or fifteen minutes. The men in the field knew that the train was coming, and were in a position to see Applegate approaching on the highway. After leaving the highway, while going to the private crossing, he "almost stopped his car," "gave his head a turn," and at the time he did so, he was at a point he could not see up the track, and to use the language of some of the witnesses, "he then put on the gas and 'eezed' the car onto the crossing"; and, when he had gotten about halfway over it, the automobile in which he was traveling was struck by the train. He and the automobile were thrown to the right or west side of the track. The parties agree that the crossing was a private one.

The questions submitted to the jury were: (a) Was it customary for the train to signal for this crossing? (b) whether the train, before it collided with the automobile, failed to give signals; and (c) whether Applegate was contributorily negligent and helped to cause the accident.

Respecting these questions, the **railroad company** in its brief makes this statement:

"On the first of these issues there was a sharp clash, but the evidence may be summed up in the

statement used by several witnesses, that some trains did customarily signal and some did not. On the second question most of appellee's witnesses stated that no signals were given, although all witnesses to the accident knew the train was approaching the crossing. * * * On the third question there is no conflict in the testimony.''

It limits its argument for reversal to:

"(1)  Prejudicial errors in evidence.

"(2)  Peremptory instruction s h o u l d have been given.

"(3)  Verdict is flagrantly against evidence.

"(4)  Instruction 1 as to signals erroneous.

"(5)  Instruction 1 as to finding against either defendant erroneous.''

Evidence as to the rate of speed the train was traveling immediately before and at the time it struck Applegate's automobile was introduced by both the administratrix and the railroad company. It was, of course, first introduced by the administratrix. The railroad company objected to this line of evidence on the theory that ''a railroad may lawfully operate its trains at such speed as is consistent with the safety of its passengers over private crossings in the country.'' Stull's Adm'x v. Kentucky T. & T. Co., 172 Ky. 650, 189 S. W. 721, 723; Louisville & N. R. Co. v. Locker's Adm'rs, 182 Ky. 578, 206 S. W. 780, 784; Louisville & N. R. Co. v. Molloy's Adm'x, 122 Ky. 219, 91 S. W. 685, 28 Ky. Law Rep. 1113.

It correctly argues that ''this court has repeatedly held that no rate of speed at country crossings, generally, is negligence.'' Louisville & N. R. Co. v. Locker's Adm'rs, supra; Louisville & N. R. Co. v. Cummins' Adm'r, 111 Ky. 333, 63 S. W. 594, 23 Ky. Law Rep. 681; Parkerson v. Louisville & N. R. Co., 80 S. W. 468, 25 Ky. Law Rep. 2260.

The railroad company, on the authority of those cases, contends that the evidence relating to the speed of the train was incompetent and its admission was a prejudicial error, demanding a reversal.

It is true that in the Locker, the Molloy, the Cum-

mins, the Parkerson, and other cases we have held that "it was error to permit opposing counsel in the examination of witnesses to inquire of the speed of the train and the distance in which it could have been stopped, and such evidence clearly is incompetent upon the trial of a case involving an accident at a rural crossing which is not unusually dangerous." Louisville & N. R. Co. v. Locker's Adm'rs, supra.

The rate of speed at which the train was traveling was not evidence of negligence, and was incompetent for the purpose of establishing a basis of a recovery, yet it was competent, as a circumstance incident to the accident in which Applegate lost his life, to be considered by the jury in connection with the other evidence, as shedding light on the actions of the parties immediately preceding, and at the time of, the accident. Louisville & N. R. Co. v. Bodine, 109 Ky. 509, 59 S. W. 740, 23 Ky. Law Rep. 147, 56 L. R. A. 506.

The administratrix only inquired of the witnesses as to the rate of speed at which the train was traveling when approaching the crossing. She did not, as was done in the cases cited and relied on by the railroad company, develop evidence as to the speed of the train and also the distance in which it could have been stopped. The court in its instructions did not submit to the jury, as an element of negligence, the rate of speed at which the train was traveling at the time of the accident.

In the cases cited by the railroad company, the instructions, especially in the Molloy Case, advised the jury to regard the speed of the train as negligence at the time of the accident, and authorized it to base its verdict thereon.

Assuming that the evidence fails to establish the existence of a custom on the part of the railroad company to give signals at this crossing, but establishes that Applegate was guilty of contributory negligence, the railroad company urges that it was entitled to a directed verdict.

The engineer in charge of its train in his testimony admitted that he always gave signals for this crossing. The testimony of many witnesses establishes that varying from 50 per cent. to 90 per cent. of the

railroad company's trains habitually gave signals for this crossing. The evidence establishing the custom to give signals for this crossing is substantially the same as that which we considered sufficient to authorize the submission of the issue to the jury and sustain its verdict in Louisville & N. R. Co. v. Engleman's Adm'r, 135 Ky. 515, 122 S. W. 833, 21 Ann. Cas. 565, and Louisville & N. R. Co. v. Engleman's Adm'x, 146 Ky. 19, 141 S. W. 374.

The Engleman Case is conclusive of the question of the sufficiency of the evidence to establish the railroad company's custom to give signals at this crossing. Also of the administratrix' right to have the case submitted to the jury as to this issue. The proven facts herein distinguished this case from Stull's Adm'x v. Kentucky T. & T. Co., supra.

The basis of the insistence that Applegate was, as a matter of law, guilty of contributory negligence, is, that it was the duty of Applegate when approaching the crossing to use such care for his own safety as is usually expected of an ordinarily prudent person to learn of the approach of the train of cars and to keep out of its way; and that the evidence establishes that he failed to exercise ordinary care within the purview of this rule. It substantially argues that the proof shows, without contradiction, that the decedent was possessed of all his faculties; that, when he approached the railroad track, the train was necessarily very close and could have been seen by him, by the exercise of the slightest care, from a point about 20 or 30 feet from the railroad track. He had but to raise his eyes toward it. He was then in a safe place, and, had he only stopped, he would have been unharmed. The bell was continuously ringing from the overhead bridge to the crossing up to the moment of the collision, and that he heard it or could have heard it by the exercise of the slightest care.

In support of this insistence, they cite to us Stull's Adm'x v. Kentucky T. & T. Co., supra; Voorheis' Adm'r v. Chesapeake & O. R. Co., 220 Ky. 746, 295 S. W. 1031; Chesapeake & O. R. Co. v. Harrell's Adm'r, 258 Ky. 650, 81 S. W. (2d) 10; Taylor's Adm'r v. Kentucky & T. R. Co., 229 Ky. 129, 16 S. W. (2d) 785, wherein we ruled that, to go upon a railroad track

just in front of a train which is rapidly approaching and which is seen and known to be approaching, or which could be known and seen to be approaching, by the exercise of ordinary care for one's own safety, is such negligence that no recovery can be had of the railroad company for the injury or death of the person who is thus negligent. This principle cannot be challenged where the developed facts authorize its application. It is true that those in charge of the train and one or two other witnesses deposed that the signal was given continuously from a point about one-quarter of a mile from the crossing until after the accident

It is undisputed that neither before nor after he turned from highway 31-W in the direction of the crossing, and traveled to within about 20 or 30 feet of the crossing, could Applegate see the train if it were at the time it reached this distance one-quarter of a mile from the crossing; nor could those in charge of the train see the automobile in which he was traveling, because of undergrowth, weeds, and bushes on the right of way of the highway. The trainmen admit that the train was traveling "about forty-five miles an hour." The engineer declared he did not see Applegate until the fireman informed him of his presence near the crossing. At that moment the train was 50 or 75 feet from the crossing. The fireman testified that he first observed Applegate's automobile on the road that came from the highway about 35 or 40 feet from the track. It is agreed that the front of the engine struck Applegate's automobile. The testimony of the engineer and fireman, manifestly, is incorrect. If the train, as the engineer testified, was running at the rate of 45 miles an hour, it covered a distance of 66 2-3 feet a second; and, if it were within the distance of the crossing—50 to 75 feet—at the moment the fireman and engineer both claim they first learned of his presence, the automobile could not have made the distance of 35 or 40 feet from the track to the crossing while the train was making the distance of 50 or 75 feet to the crossing. If the automobile was the distance from the crossing, when the fireman first observed it, as he stated it was, and if the train were traveling the rate of 45 miles an hour, it would have passed over the crossing before his automobile reached it. The fact that it was entirely on the crossing at the time it was

struck by the train demonstrates that the automobile was on the crossing at the time the fireman first discovered its presence, considering the speed of the train. It is argued that, after he reached a point 20 or 30 feet from the crossing, he could see the train on the track one-half mile or farther from the crossing. The natural inference is that, if he could see the train when he was that distance from the crossing, those in charge of the train could see him, and easily could have given a signal to warn him against moving toward the crossing. The witnesses for the estate testify that no signals were given. It was within the province of the jury to accept the evidence in behalf of the estate or that in favor of the railroad company on this crucial point.

The jury was justified in disregarding the testimony of the engineer and fireman in this respect.

Many witnesses testified that the train gave no signals, "made no sound at all"; it was "just slipping right up"; and as it struck the automobile it whistled for the first time. In the language of a number of witnesses, "you can't see the train until you get very near on the track"; and, as he turned into the road leading to the crossing, he slowed down and thereafter traveled at about 10 miles an hour. In the language of some of the witnesses, he had "eezed" onto the track to the center of the crossing at the time the train struck the automobile. Considering the train was traveling at the rate of 45 miles an hour or 66 2-3 feet per second, and that, after the automobile had reached that point from which it could see the approaching train, no signals were given for the crossing, as it was established by the evidence of the administratrix, plainly, it was a question for the jury to determine whether he, while at a point of safety, failed to exercise, or exercised, ordinary care to learn of the approaching train and keep out of its way. Witnesses for the administratrix expressed the opinion that the train was traveling at a greater rate of speed than 45 miles an hour. Whilst the speed of the train was not evidence of negligence, yet its speed, as well as the speed of Applegate's automobile, was a circumstance to be considered by the jury in determining whether Applegate when he was at a point from which he could see the train or at a

place of safety, within the time at his command, exercised, or failed to exercise, ordinary care to learn of the approach of the train and keep out of its way.

It cannot be presumed that he heard train signals when others who were near and looking at the train as it approached the crossing declare no signals were given; nor should he be held to that degree of accuracy of judgment as if he heard them when he was at a safe distance from the crossing, and had time in which to choose the safest course to pursue to protect himself from the train's approach to, and use of, the crossing.

It is general knowledge that in traveling along the highways the average person engages in thought involving business affairs, domestic trouble, and numerous other considerations which are closely connected with the individual. Henderson v. O'Leary, 177 Wis. 130, 187 N. W. 994, 24 A. L. R. 942. And it is for this reason that a traveler on a road leading to a crossing of the character now under consideration is entitled to rely upon those in charge of the train performing their customary duty to give signals of the train's approach to afford timely warning to those near or about to use the crossing. Hopper v. Barren Fork Coal Co., 263 Ky. 446, 92 S. W. (2d) 776, 781; Louisville & N. R. Co. v. Henry's Adm'r, 252 Ky. 278, 66 S. W. (2d) 818; Cox's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 238 Ky. 312, 37 S. W. (2d) 859.

As we said in Louisville & N. R. Co., et al. v. Ratliff's Adm'r, 260 Ky. 380, 85 S. W. (2d) 1006, 1010, and Hopper v. Barren Fork Coal Co., supra:

"The law recognizes the thoughtlessness of human beings when, as members of the traveling public, they approach and use a railroad crossing of the character of that here involved, and for their protection the statute exacts of the company, or those in charge of its trains, the imperative duty to give the crossing signals prescribed by it, and accords to the members of the traveling public the right to rely thereon, when using such crossing, exercising at the time that degree of care ordinarily prudent persons usually exercise under like or similar circumstances."

The reasons for, and the principles embraced in, this pronouncement, apply in the present case.

The presumption is always that no one will voluntarily do, or fail to do, an act that places his own life in peril, and, if there is no evidence to the contrary, that he took ordinary precaution for his own safety. Owen Motor Freight Lines v. Russell's Adm'r, 260 Ky. 795, 86 S. W. (2d) 708; Green v. Texas & Pac. Ry. Co., 125 Tex. 168, 81 S. W. (2d) 669. In other words, the law will not presume suicide. Vicars v. Aetna Life Ins. Co., 158 Ky. 1, 164 S. W. 106; Louisville & N. R. Co. v. Snow's Adm'r, 235 Ky. 211, 30 S. W. (2d) 885; Sovereign Camp, Woodmen of the World, v. Valentine, 173 Ky. 182, 190 S. W. 712. And where one has the right to be, it will not be presumed that he carelessly imperiled his own life. Cox's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 238 Ky. 312, 37 S. W. (2d) 859.

Applegate's estate is entitled to invoke these general principles to exculpate the deceased of contributory negligence. Owen Motor Freight Lines v. Russell's Adm'r and Louisville & N. R. Co. v. Snow's Adm'r, supra.

See the Ratliff, the Hopper, the Russell, and the Snow Cases, supra. Louisville & N. R. Co. v. Muncey, 229 Ky. 538, 17 S. W. (2d) 422; Cox's Adm'r v. Cincinnati, N. O. & T. P. R. Co., supra; Louisville & N. R. Co. v. Crockett's Adm'x, 232 Ky. 726, 24 S. W. (2d) 580; Barton Payne, Agent, etc., v. Bowman's Adm'x, 200 Ky. 171, 252 S. W. 1010, 1011.

It was not the duty of Applegate in approaching the crossing to stop, look, and listen before attempting to cross the railroad track. By a long line of decisions in this state this doctrine has been condemned. Louisville & N. R. Co. v. Ueltschi's Ex'rs, 97 S. W. 14, 29 Ky. Law Rep. 1136; Cox's Adm'r v. Louisville & N. R. Co., 104 S. W. 282, 31 Ky. Law Rep. 875; Louisville & N. R. Co. et al. v. Ratliff's Adm'r, supra.

"He is not here to speak for himself."

No witness was close enough to observe and to know whether he saw, or did not see, the train; whether he "looked or listened" for it when he was at a safe distance from the railroad track; or whether when he

first discovered its approach he was then in a place of danger and unable to escape the catastrophe. . To use the language of the Bowman Case:

"In such cases the rule in this state is, not that a recovery will be prevented by the mere failure of the person killed to stop, look, and listen, but that it is a question for the jury whether such person exercised such care as may be reasonably expected of an ordinarily prudent person under the circumstances; and this must be determined by the jury from the evidence."

"On the whole of the evidence and the reasonable inferences deducible therefrom, it is satisfactorily shown that he was not guilty of contributory negligence, but for which he could not have lost his life. Green v. Texas & Pacific Ry. Co. [125 Tex. 168] 81 S. W. (2d) 669."

Louisville & N. R. Co. v. Ratliff's Adm'r, supra.

The court in submitting the issues to the jury gave the instructions, approved in Louisville & N. R. Co. v. Engleman's Adm'r, 135 Ky. 515, 122 S. W. 833, 21 Ann. Cas. 565, and Louisville & N. R. Co. v. Engleman's Adm'x, 146 Ky. 19, 141 S. W. 374, and Simpson v. Louisville, H. & St. L. R. Co., 207 Ky. 623, 269 S. W. 749.

The principles embodied in them were first recognized and adopted by this court in Louisville & N. R. Co. v. Bodine, supra.

The engineer, Ivin Highbaugh, was sued with the Illinois Railroad Company. The court's instructions advised the jury it could in its discretion find for Applegate's administratrix against the Illinois Central Railroad Company or Highbaugh, or both of them. The Illinois Central contends this is a reversible error.

The jury's verdict was for the administratrix against only the Illinois Central Railroad Company. It concedes the verdict conforms to the rule stated in Illinois Central R. Co. v. Murphy's Adm'r, 123 Ky. 787, 97 S. W. 729, 30 Ky. Law Rep. 93, 11 L. R. A. (N. S.) 352, and many other subsequent cases, and urges that we recant and adopt the opposite rule applied in other jurisdictions. In the Murphy Case, the rule was first announced that, where a recovery is sought against the

master or principal solely on account of negligent acts of his servant or agent, a verdict in favor of the servant or agent does not preclude a judgment against the master or principal. The rule has been referred to in the following cases: Chesapeake & Ohio Railway Company v. Booth, 149 Ky. 245, 148 S. W. 61; Broadway Coal Mining Company v. Robinson, 150 Ky. 707, 150 S. W. 1000; Illinois Central Railroad Company v. Outland's Adm'x, 160 Ky. 714, 170 S. W. 48; National Cash Register Company v. Williams, 161 Ky. 550, 171 S. W. 162; Weil v. Hagan, 166 Ky. 750, 179 S. W. 835; J. I. Case Threshing Company v. Haynes, 178 Ky. 644, 199 S. W. 786; Buskirk v. Caudill, 181 Ky. 45, 203 S. W. 864; Id., 182 Ky. 685, 206 S. W. 867; Illinois Central Railroad Company v. Lashley, 208 Ky. 374, 270 S. W. 806; Myers' Adm'x v. Brown, 250 Ky. 64, 61 S. W. (2d) 1052; Nashville, C. & St. L. Railway Company v. Byars, 252 Ky. 507, 67 S. W. (2d) 497. The rule was based on the theory that the master and servant were joint tort-feasors. The theory, of course, was erroneous. The master's liability rests upon the doctrine of respondeat superior, and, unless negligence on the part of the servant is shown, a recovery against the master cannot be had. What was said in the Murphy Case and several other cases following it was unnecessary to the decision of the particular case, since the liability of the master was not predicated solely upon the negligence of the servant in whose favor a verdict had been found, but there were allegations and proof of negligence by other servants or the master himself. In other jurisdictions where the question has been considered, it is held that a verdict against the master, after a finding in favor of the servant, in an action brought against the master and servant for damages caused solely by the negligence of the servant, is inconsistent and illogical and should not be permitted to stand. Some of the foreign cases on the subject are: Hobbs v. Illinois Central Railroad Company, 171 Iowa, 624, 152 N. W. 40, L. R. A. 1917E, 1023; D. B. Loveman Company v. Bayless, 128 Tenn. 307, 317, 160 S. W. 841, Ann. Cas. 1915C, 187; Pettis v. Standard Oil Company of N. J., 176 S. C. 88, 179 S. E. 894; McGinnis v. Railway Co., 200 Mo. 347, 98 S. W. 590, 9 L. R. A. (N. S.) 880, 118 Am. St. Rep. 661, 9 Ann. Cas. 656; Lowney v. Butte Electric Railway Company, 61 Mont. 497, 204 P. 485; Southern Railway Company v. Harbin, 135 Ga. 122, 68 S. E. 1103, 30 L. R. A. (N. S.) 404, 21 Ann. Cas. 1011.

The sole negligence relied upon in this case was the failure of the engineer to give a warning signal at the crossing, and if this were a case of first impression we would not hesitate to adopt the rule followed in practically all other jurisdictions. But, if the case should be reversed now, it could not be sent back for a new trial and the appellee would be left without remedy, since the judgment in favor of the engineer has become final and the only consistent judgment that could be entered as between the appellant and the appellee would be one dismissing the petition. This situation did not result from the fault of the appellee. He practiced the case, and the court instructed the jury, in conformity to the rule announced in the Murphy and subsequent cases. Had the rule been otherwise, he would have been required, in order to preserve his right of action against the railroad company, to make a motion for a new trial as to the engineer, Highbaugh, and the trial court could have corrected the incongruous situation created by the inconsistent verdicts by sustaining both motions for a new trial. We do not think the present case is a proper one in which to consider the overruling of our former opinions.

The evidence of the number of the members of Applegate's family was irrelevant. Its admission is not, of itself, grounds for reversal.

Perceiving no other error, and it appearing that the Illinois Central Railroad Company had been accorded a fair and impartial trial, the judgment is affirmed.