## Louisville & N. R. Co. et al. v. Ratliff's Adm'r.

(Decided June 21, 1935.)

(As Modified on Denial of Rehearing Oct. 1, 1935.)

ASHBY M. WARREN, C. S. LANDRUM and D. I. DAY for appellants.

E. J. PICKLESIMER, W. K. STEELE and W. L. BOLLING for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

We are required to review a trial to a jury in an action of Bee Ratliff's administrator against the Louisville & Nashville Railroad Company, for the death of Ratliff, and the destruction of his truck, occurring on April 5, 1932, caused by a collision between the loaded truck which he was operating, and a freight train of the

latter. The trial resulted in a verdict in favor of his estate for $7,000 for his death, and $500 for the destruction of the truck.

The railroad company is here insisting that Ratliff was contributorily negligent as a matter of law, and a peremptory instruction should have been given directing a verdict in its favor, but if it is not entitled to a reversal on this ground, his contributory negligence is so preponderantly established as to render the jury's verdict flagrantly against the evidence. Also, it complains of the given instructions and the action of the court in refusing offered instructions.

The basis of the estate of Ratliff's cause of action is, that "the whistle of the defendant's train was not sounded, or the bell rung, at a distance of at least fifty rods from the crossing * * * continuously or alternately" "until the engine reached the crossing"; that by reason thereof "the truck was struck" by the defendant's train at the crossing, instantly killing him.

The railroad company's defenses are a traverse and a plea of contributory negligence which is controverted by a reply. The railroad company's right to a reversal must be determined on the facts adduced.

The collision occurred about 3:40 p. m. "The decedent could have seen the train at any point between the crossing and the cut, 360 feet therefrom." Driving the truck, he approached the crossing from the south to the point from which he could see the train 360 feet from the crossing; "295 feet from the crossing, the decedent passed a standard crossing sign, erected by the State Highway Commission, and 175 feet from the crossing a curve sign indicating a sharp curve in the highway just after it crossed the railroad, as well as the standard crossing sign 12 feet from the crossing." The freight train came from the east on Potter's fork branch. "The engine was backed up, pushing the caboose ahead of it. Behind the engine was five cars of coal picked up at Haymond, about 1¼ to 1½ miles of the crossing." The witnesses do not agree on the rate of speed at which either the train or the truck was traveling. The train had to stop for the derail to be thrown, "543 feet from the crossing"; "the switch connection being only about 750 feet from the crossing." "On the platform of the caboose, keeping a lookout," were Brakemen Smith and Blair. The engineer and

firemen were at the place of the performance of their duties in the operation of the train. There were "two ways to ring the bell"; the fireman "with the rope," and "the engineer throwing on the air brake." The bell when set to ringing by the air brake did so automatically.

Bryant Holcomb, the fireman, testified that "the bell had been ringing all along at all these crossings up and down through there just like others do," and as the train approached the crossing, the engineer "had hold of the lever blowing the whistle, then I looked over at him, happened to look at him and he was standing with his back toward the outside of the cab and pulling down on the lever and pulled down stronger, standing with his back toward the truck and his hand come from the lever and threw on the emergency."

Hugh Strunk, a brakeman, testified that he was on the caboose next to the engine which was backing up. He "jerked the angle cock open, but the engineer had done got all the air"; "he had pulled the crossing signal whistle"; "two brakemen on the platform were blowing the back-up whistle"; "an air whistle."

Polkie Smith, a brakeman, "was on the caboose on the outside platform." He testified: "I was using a whistle, sounding the whistle, the air whistle." The engine whistle sounded on that occasion as it approached the crossing, and "blowed the regular road crossing signal." It did so, "back a piece from the crossing, and on down to the crossing."

Otis Mackey, the engineer, stated that "coming down there, there is a highway crossing there, and back about the usual distance, or proper distance, I started sounding the whistle and continued to sound it until * * * the only time I quit sounding it was when I turned it loose and grabbed the emergency and applied it." "I commenced sounding the whistle around twenty car lengths up the branch, before I got to the crossing"; the average length of a car was around forty feet. He claims "the bell was ringing after the accident happened"; he went back and "shut it off after the accident." "It was turned on before the accident happened"; it began ringing about the time the whistle began to blow. He used this language:

"I saw the truck come around the curve down onto the straight part of the highway and when he com-

.menced getting a little closer here on the last sound of the whistle I pulled down a little louder thinking he was going to drive right up and stop and the caboose got the crossing about halfway filled and looked to me like he tried to drive around the end of the caboose."

He claims that at that time the train was traveling at the rate of about ten miles an hour and the truck "running about three times as fast."

Milton Hall was in an automobile which was setting on the bridge at the crossing, near where the collision occurred. He departed from Jenkins about the time the train left and reached the railroad crossing a few minutes before the accident. His statement is:

"I couldn't tell the speed of the truck changed any, the truck, when I first noticed the truck, that s after the truck, after he acted like he aimed to try and stop from the way he was weaving backwards and forwards"; "looked the way the truck acted that the man was trying to stop it, when it was about 200 or 300 feet when it first came around the curve."' "I couldn't say whether the speed increased after I saw the train come, and try to stop it was so quick from that time until the train hit him that a man couldn't tell." "They were tooting the whistle, all the way down the road, the road as I come down; that is, down between up there when I could see it, I lost sight of the train for a little ways above the crossing."

A. G. Gilley, a coal loader, testified:

"The train picked up speed from about that rock cut all the way down to the crossing best I could tell," "near to the grade crossing."

Henry Quillen claimed that he heard "the train whistle" and "the crash all about the same time."

Preston Bentley heard the whistle before he heard the crash; "several blasts of the whistle."

Laura Bentley first heard the train whistle "four times for the road crossing"; "then whistled the distress whistle"; "then heard the crash."

Clyde Bentley heard the train blow four times for the crossing; "heard the distress whistle at the crossing."

Charlie Riggs, while "playing marbles," "heard the train blow."

Rhoda Venters stepped out on a porch to her home, "when the train was coming down and blowing"; she watched it until it came around some buildings, when she turned and walked into the house.

Charlie Speaks said: "As that train approached that crossing I heard the whistle."

Louis Minkey heard the whistle blowing "some piece above the garage"; it "blowed until it passed the garage." The crossing is some 200 or 300 feet from the garage.

Contrary evidence, relating to the ringing the bell and blowing the whistle, is the testimony of Jesse Cooley. At the time the train was approaching the crossing and at the time of the collision, he was about 50 yards away. He heard "the bell ring but one time." "It was not ringing before nor at the time of the collision."

Stanley Cooley was walking by the side of Jesse Cooley. He approxmated the distance he and Jesse Cooley were from the crossing at 100 feet. He testified he did not hear the whistle or the bell ring. He saw the collision. He did not hear the noise of the train until Jesse Cooley stated to him he heard the train whistle; and after his attention was called to the fact the train was coming, it did not thereafter blow the whistle nor ring the bell.

Ora Sanders was near the accident in company with Eva Edens and Emma White. Before the collision she heard "a rumbling noise of the train"; "did not hear it blow the whistle nor ring the bell."

Eva Edens stated the train made no noise "other than the rumbling of the train on the track." It did not blow the whistle nor ring the bell.

Emma White was unable to say whether the whistle blew or the bell rang. Her words are: "I could not say, I don't remember that I did."

This tedious resume of the evidence bearing on the decisive pivotal issue shows that it is conflicting, though numerically the weight thereof is in favor of the railroad company.

One witness in behalf of the estate testifies the

train whistle blew one time; two of them, that the whistle did not blow nor the bell ring after their attention was called to its presence. The other witnesses of the estate, who were present and near enough to see and hear the train, declare that they did not hear either the whistle blow or the bell ring.

The rule is, in such a case, negative evidence, ordinarily, is not of the same weight as positive, yet the testimony of those who had an opportunity to hear, but did not hear any signals, is admissible, and the weight to be given it is for the jury. Louisville & N. R. Co. v. Molloy's Adm'x, 107 S. W. 217, 32 Ky. Law Rep. 745; Louisville Ry. Co. v. Sheehan's Adm'x, 146 Ky. 168, 142 S. W. 221.

Negative testimony to the effect that he did not hear signals given, where the witness is near enough to hear them, is sufficient to sustain a jury's verdict, though it conflicts with other evidence that a warning was actually given. Rogers et al. v. City of Los Angeles (Cal. App.) 44 P. (2d) 465.

It is true, positive evidence is entitled to greater weight than negative evidence (Cabble v. Hawkins, 186 Ky. 114, 216 S. W. 345), and where there is positive testimony that signals were given, purely negative testimony is of little weight (Miller v. Louisville Ry. Co., 148 Ky. 126, 146 S. W. 26), yet the jury, when considering its verdict, and the court, in reviewing it, should give some weight to the negative testimony. Nashville, C. & St. L. Ry. Co. v. Byars, 233 Ky. 309, 25 S. W. (2d) 733.

Here, we have positive testimony corroborated by negative testimony that no signals were given as required by the statute, although much testimony to the contrary was introduced. In connection with this statement, it should be noted that the testimony of the majority of the company's witnesses shows that between the time of the giving of the signal for the crossing to the moment of the distress signal, that neither the whistle nor the bell signals were given. And to this extent their testimony corroborates that of the estate's witnesses. It is apparent that the court was fully justified in overruling the company's motion for a peremptory instruction, unless the evidence sufficiently establishes contributory negligence of Ratliff, as to make the question one of law. Louisville Gas & Electric Co. v.

Nall, 178 Ky. 33, 198 S. W. 745; Ashland Coal & Iron Ry. Co. v. Wallace, 101 Ky. 626, 42 S. W. 744, 43 S. W. 207, 19 Ky. Law Rep. 849; Cincinnati, N. & C. Ry. Co. v. Rairden, 231 Ky. 141, 21 S. W. (2d) 236.

As to his contributory negligence, it is necessary to advert to the testimony relating to it.

Jesse Colley testified thus:

"Well, the train was coming out of Potter's fork there and the truck was coming up the other way and the truck looked to me like it was going to stop, but the front wheels were very near, well I will say they were over the last rail crossing the road when the train hit him; the train hit the truck and turned him about a hundred feet I guess or more before they could stop, rolling or sliding the truck down under the caboose."

Hugh Strunk described the movement of the truck from the point at which he first saw it, in these words:

"Well, I looked from the cupola of the train to the truck and I seen it coming at a high rate of speed and we were backing up toward the crossing and he got pretty close, and looked like he reached down for the emergency brake, something that way and run right into the caboose; hit the end of the caboose, looked like; looked like he made a surge like he was going by, but couldn't stop."

Henry Blair described the impasse of the truck and train substantially in the language of Strunk. Hall's testimony bearing on the operation of the train is substantially the same.

The company strenuously insists that this testimony convicts Ratliff of contributory negligence of such a degree as to entitle it to a directed verdict.

In determining the question of his contributory negligence, it is fair and proper to keep in mind that he could only see the crossing when 360 feet therefrom, and that, whatever rate of speed at which his truck was traveling, but only a few seconds were required to cover this short distance. Also, to consider in this connection the testimony of witnesses that they were near enough to see the train and to hear the sounding of the whistle and the ringing of the bell, and that it did neither. Manifestly, it should not be presumed that, in making this short distance, that he heard that which

these witnesses declare they did not hear and others that neither the whistle sounded nor the bell rang while he was making this distance. While it was his duty to exercise ordinary care to learn of the approach of the train and exercise ordinary care for his own safety, while making this distance, yet he was entitled at the same time to rely on those in charge of the train performing their statutory duty of sounding the whistle and ringing the bell in the manner prescribed by the statute, to give him timely warning of its approach at the crossing. The law recognizes the thoughtlessness of human beings when, as members of the traveling public, they approach and use a railroad crossing of the character of that here involved, and for their protection the statute exacts of the company, or those in charge of its trains, the imperative duty to give the crossing signals prescribed by it, and accords to the members of the traveling public the right to rely thereon, when using such crossing, exercising at the time that degree of care ordinarily prudent persons usually exercise under like or similar circumstances.

The sum of the evidence bearing on the question of the movements of Ratliff's truck establishes that Ratliff, because of the failure of those in charge of the train to perform their statutory duties, induced him to go upon the crossing at the moment and in the manner in which his truck entered upon it, and in the emergency thus created, imperiling his life, he pursued the course that semed best to him, in the circumstances, to avert the impending danger. With the testimony of at least two of the witnesses who testified in behalf of the estate, that neither the whistle sounded nor the bell rang, and others that they did not hear either, he should not be held to that degree of accuracy of judgment as though he had had time for deliberation, or that he heard the sounding of the whistle or the ringing of the bell which was not heard by others immediately near, and others who declare they heard neither, or any noise other than the "rumbling of the train." Louisville & N. R. Co. v. Henry's Adm'r, 252 Ky. 278, 66 S. W. (2d) 818. If Ratliff, like those who were present and who declare neither the whistle was sounding nor the bell ringing, or did not hear either, until he was so near or on the crossing that his life was in peril, because of the fault of those in charge of the train, the company cannot escape the consequences on the theory of contributory

negligence. Knapp v. Gibbs, 211 Ky. 278, 277 S. W. 259; Louisville Taxicab & Transfer Co. v. Reno, 237 Ky. 452, 35 S. W. (2d) 902; Lawson's Adm'r v. Brandenburg, 240 Ky. 68, 41 S. W. (2d) 201; Fiechter v. City of Corbin, 254 Ky. 178, 71 S. W. (2d) 423.

Looking at the happening of the accident from the viewpoint established by the evidence in behalf of the railroad company, there was no emergency created endangering the life of Ratliff, but that he deliberately ran in front of the train and lost his life. Looking at it with the evidence in behalf of the estate in mind, which it was the province of the jury to do, the failure to sound the whistle and ring the bell induced Ratliff to go upon the crossing at the time and in the manner described by even the company's witnesses. Ratliff's estate, in aid of its view of the evidence, is entitled to invoke the principle "that it will not be presumed in case of death, one will voluntarily do, or fail to do, an act that places his own life in peril; but that he took ordinary precaution in the existing emergency for his own safety."

On the whole of the evidence and the reasonable inferences deducible therefrom, it is satisfactorily shown that he was not guilty of contributory negligence, but for which he would not have lost his life. Green v. Texas & Pacific Ry. Co. (Tex. Com. App.) 81 S. W. (2d) 669.

It was not the duty of Ratliff in approaching the crossing, to stop, look, and listen before attempting to cross the railroad track. By a long line of decisions in this state, such doctrine has been condemned. Louisville & N. R. Co. v. Ueltschi's Ex'rs, 97 S. W. 14, 29 Ky. Law Rep. 1136; Cox's Adm'r v. Louisville & N. R. Co., 104 S. W. 282, 31 Ky. Law Rep. 875. It was his duty only to use such care as would be usually expected of an ordinarily prudent person to learn of the approach of the train and keep out of its way; and if he failed to exercise such care, and but for such failure he would not have been injured, then the railroad company was excused from liability for his death. Chesapeake & O. R. Co. v. Patrick, 135 Ky. 506, 122 S. W. 820; Owensboro City R. Co. v. Wall, 142 Ky. 86, 133 S. W. 1145; Cincinnati, N. O. & T. P. Ry. Co. v. McElroy, 146 Ky. 668, 142 S. W. 1009; Simpson v. Louisville, Henderson & St. Louis R. Co., 207 Ky. 623, 269 S. W. 749;

Louisville & N. R. Co. v. Bays' Adm'x, 220 Ky. 458,. 295 S. W. 452.

The railroad company presents its right to a peremptory instruction and its objection to the given instructions on the theory that, since the trainmen testified they saw Ratliff's truck approaching the crossing and the whistle was sounding and the bell ringing, that Ratliff had notice of the approach of the train in time to have avoided the collision. This theory of its liability overlooks entirely the testimony of the witnesses in favor of the estate. Their testimony was sufficient. to, and did, convince the jury, that neither the whistle was sounded nor the bell rung, and that Ratliff had no notice of the approach of the train until he was in the act of crossing the highway in front of it. It is true where one has notice of the approach of a train and undertakes to cross the railroad track in front of it, he is not entitled to recover for an injury thereby sustained, no matter how careless the carrier or its agents may be, unless after his peril was discovered, those in charge of the train, with the means at their command, could have avoided injuring him. Barrett's Adm'r v. Louisville & N. R. Co., 206 Ky. 662, 268 S. W. 283.

The entire argument of the railroad company overlooks the recognized rule that where it is shown that a witness or witnesses are near enough to hear and are in a position to hear, and are possessed of the usual auditory faculties and are able to hear the blasts of a train whistle or other train signals, but did not hear such signals, the case is one for the jury, even though it is testified by the train operatives that signals were given. Hertell's Adm'x v. Louisville & N. R. Co., 215 Ky. 639, 286 S. W. 693.

It is very clear that this is a case in which men of ordinary judgment might differ as to whether Ratliff was killed, because of his failure to exercise that degree of care that prudent persons ordinarily exercise under like circumstances, or by reason of those in charge of the train not giving the signals required by the statute. These questions were for the jury (Wright v. Cincinnati, N. O. & T. P. R. Co., 94 Ky. 114, 21 S. W. 581, 14 Ky. Law Rep. 788), and the company is not entitled to have the issue determined solely by the testimony of its witnesses, as furnishing the only correct solution of the happening of the accident. It was exclusively its

province to accept the testimony of the witnesses of the estate or that of those of the railroad company as to the issue of the sounding of the whistle and the ringing of the bell, and as to whether Ratliff had notice of the approach of the train a sufficient time in advance of his approach of the crossing to have avoided the collision by the exercise of ordinary care for his own safety, but failed to do so.

The railroad company presents section 2739g-51, Kentucky Statutes (as amended by Acts 1930, c. 79), as a bar to the estate's recovery, insisting that the evidence establishes that Ratliff approached the crossing at a greater rate of speed than twenty miles per hour, or more than was reasonable or proper, having due regard for traffic and the use of the highway. It insists that because the evidence shows he approached the crossing at a greater rate of speed than twenty miles per hour and the statutes make such rate of speed prima facie evidence of unreasonable and improper driving, it was entitled to a directed verdict. It argues:

"In the absence of other evidence to overcome the presumption created by the statute, it is accepted as a fact established [Kappa v. Brewer, 207 Ky. 61, 268 S. W. 831; Hornek Bros. v. Strubel, 212 Ky. 631, 279 S. W. 1087]. And where, as in the case at bar, there is no proof even tending to overcome the prima facie presumption created by the statute, that presumption becomes conclusive. This statute applies in the case at bar, as the accident happened in the town of Neon."

The trial court gave to the jury instruction No. 3, defining Ratliff's duty as to the speed of the truck on approaching and using the crossing, substantially in the form of an instruction approved in Utilities Appliance Co. et al. v. Toon's Adm'r, 241 Ky. 823, 45 S. W. (2d) 478. It is all the company was entitled to. The speed of the truck was merely a circumstance to be considered in connection with the other evidence tending to prove contributory negligence.

The other given instructions in form have been often approved. See Chesapeake & O. R. Co. v. Patrick, 135 Ky. 506, 122 S. W. 820; Owensboro City R. Co. v. Wall, 142 Ky. 86, 133 S. W. 1145; Cincinnati, N. O. & T. P. Ry. Co. v. McElroy, 146 Ky. 668, 142 S. W. 1009; Simpson v. Louisville, Henderson & St. Louis R. Co.,

207 Ky. 623, 269 S. W. 749; Louisville & N. R. Co. v. Bays' Adm'x, 220 Ky. 458, 295 S. W. 452.

The railroad company quotes the instruction set out in the opinion in Payne, Agent, v. Bowman's Adm'x, 200 Ky. 171, 252 S. W. 1010, with the suggestion that this court said it "aptly stated the law." In that case the railroad company appealed, complaining of the form of the instruction. It was our expressed view the instruction was not prejudicial to its rights. We did not say, nor intimate, that the principle embraced in it could not or should not be otherwise phrased. We did say, however, that "in such cases the rule in this state is, not that a recovery will be prevented by the mere failure of the person killed to stop, look and listen, but that it is a question for the jury whether such person exercised such case as may be reasonably expected of an ordinarily prudent person under the circumstances; and this must be determined by the jury from the evidence." The given instructions in the present case accurately present this principle, and are not susceptible of the criticism urged against them.

On the whole of the evidence, it was sufficient to authorize the submission of the case, and also to sustain the jury's verdict.

Wherefore, the judgment is affirmed.

The whole court sitting, except Ratliff, J., who took no part in the case.