## Louisville & N. R. Co. v. Mitchell's Adm'x.

Feb. 3, 1939.

672

ASHBY M. WARREN, J. MILLER WHITE and TYE, SILER, GILLIS & SILER for appellant.

C. B. UPTON and R. L. POPE for appellee.

Opinion of the Court by Sims, Commissioner— Reversing.

G. S. Mitchell, a man about 58 years of age, physically and mentally sound, who some 12 or 15 years ago worked for the appellant as telegraph operator at Woodbine, Kentucky, was killed by a fast passenger train of appellant's when he stepped directly in front of it while attempting to cross the railroad tracks about 4:30 P. M., January 20, 1937, at a public grade crossing located near the depot in the village of Woodbine. His widow qualified as his administratrix and brought this action in the Whitley Circuit Court, alleging negligence in the operation of the train, which suit resulted in a verdict for her in the sum of $4,000, upon which judgment was entered. The main ground upon which appellant relies for reversal of this judgment is the refusal of the trial court to peremptorily instruct the jury to find a verdict for it because appellee's decedent was guilty of contributory negligence as a matter of law in stepping directly in front of the approaching train.

Appellee alleged in her petition the crossing where the accident occurred was unusually dangerous due to a curve just south thereof, which, with a toilet six feet by twelve feet located near the tracks, obstructed the view of one approaching the crossing from the west, as

was decedent, and that this was a crossing over which many people traveled every day; that the appellant was operating its train at an excessive rate of speed; that no lookout was maintained and no signals were given as the train approached the crossing on this occasion. Appellant's answer contains a general denial and an affirmative plea of contributory negligence which latter plea appellee traversed in her reply.

Woodbine is an unincorporated village with a population of from 500 to 1,000 people residing in the community, and various witnesses estimated about this number of persons passed over this crossing each 24 hour period. There were three tracks at this crossing, the west track is the main line upon which the train was running and just east of it is the passing track, and east of that is the storage track. The curve immediately south of the crossing is not sharp, because from there one can see south down the track for 1087 feet. There is much testimony in the record about signals being given at what is referred to as the "brick yard crossing" and at the "whistle post," therefore it may help to locate these points in reference to where the accident happened. The brick yard crossing is 1,922 feet south of the crossing where the accident occurred, and the whistle post is 517 feet south of the crossing where the accident occurred. The train which figured in the accident was a passenger train carrying 15 coaches proceeding north at a speed estimated by the various witnesses at anywhere from 50 to 70 miles per hour, and it was running 15 minutes late. The uncontradicted testimony is the train blew for the brick yard crossing, and just south of the whistle post it blew for the board at Woodbine. "Blowing for the board" means the train whistles for the operator to signal it by a light whether the track is clear and when the operator changes the light and gives the train the right of way, it answers the signal light with its whistle. The uncontradicted testimony is that the train blew two long blasts, a short, and a long blast of its whistle for the brick yard crossing, and in blowing for the board it blew four long blasts and when the board was given it, the train answered with two short blasts of its whistle. Therefore, throughout this opinion when we say the train blew for the brick yard crossing, we mean it gave two long blasts, a short and a long blast of its whistle; and when we say it blew for the board we mean it gave four long blasts of its

whistle and when the board was given it the train answered immediately by two short blasts of its whistle. Unless otherwise designated, when we use "crossing" we have reference to the railroad crossing at Woodbine, very near the depot, where this fatal accident happened.

The testimony for appellee is her decedent left the automobile of Lewis Durham which was parked on the side of the highway about 50 feet from the crossing, where decedent was joking with Durham, or some persons in his car, for a short time, and then proceeded to walk towards the crossing. Just as he came within a very few feet of the west track (the witnesses put it at distances varying from two to six feet), he stopped and stooped down as if to tie his shoe and when he got up he, without turning, or raising his head, stepped in front of the train which was not over 50 feet from him, traveling from 50 to 70 miles per hour. The 13 witnesses testifying for the appellee as to the manner in which the accident happened were located at various distances and in various positions from the crossing and each and every one of them testify they knew the train was approaching. Some heard the noise, or roar, of the train, some saw it approaching the station, and some heard it whistle for the brick yard crossing, or the whistle post, or both the brick yard crossing and the whistle post, but they all knew the train was approaching Woodbine.

Without considering the testimony of the train crew, or that part of the testimony of the witnesses at or near the place of the accident as to whether or not the statutory signals were given, there were 7 witnesses testifying for the appellant and they all heard the train blow either for the brick yard crossing or blow for the board (some heard it blow for both), and they all knew the train was approaching the crossing. Joe Helton, a witness for appellant, testified he and decedent were the best of friends and were in Barton's Restaurant for 20 or 30 minutes talking and they left the restaurant together, decedent preceding him out the door, and when they got near the highway the train blew at the brick yard crossing and decedent said, "We had better hurry and get across, that fast train is coming." He and decedent then walked about 30 feet together when somebody in Lewis Durham's automobile said to decedent, "What will you give me on a shave?" Decedent re-

plied, "A dime," and stopped at the automobile. Helton kept on walking towards the crossing as fast as he could and got on the east track when the train answered the board; he did not look back to see what had become of decedent. Steeley Burke, another defense witness was at the depot about fifty feet from the crossing and he heard the train blow for the brick yard crossing and for the board. This witness saw decedent stop about eight feet from the track, stoop down as if to tie his shoe and when he raised up and started toward the track the witness screamed at him and hollered at him but decedent did not look and the witness turned his back to keep from seeing him hit as he walked onto the track in front of the train. Byron Parsons heard the train blow for the brick yard crossing and for the board. He passed decedent while he was tying his shoe and they spoke and decedent came on after him, but witness was going much faster and got over the crossing in safety.

There were twenty witnesses (13 for appellee and 7 for appellant) testifying in this case as to the approach of the train and none of the twenty was in a better position to hear the train than decedent. Each of these twenty witnesses heard the noise, or roar, of the train, or its whistle and all of them knew the train was approaching. In addition to this, we have the uncontradicted testimony of Joe Helton that decedent knew the train was coming because he said to Helton, "We had better hurry and get across, that fast train is coming." This testimony leaves no doubt in the mind but that decedent knew this train was approaching. Counsel for appellee in their brief make a determined attack on the testimony of Joe Helton. While admitting he is not contradicted by a single witness, nor is he impeached, yet they contend the physical facts and the element of time show his testimony to be untrue—even intimating in their argument they have some doubt as to his being at the scene of the accident. Appellee further argues Helton did not relate the words of decedent about hurrying to beat the train over the crossing in reporting to the widow how the accident occurred. We all know the human characteristic to omit some part from a narrative unless asked directly about the omitted part. The omission by Helton does not impeach him in our judgment. Regardless of whether or not decedent made such a statement, the evidence of twenty witnesses show he knew the train was approaching. In the meas-

urement of distance and time the human mind, when acting in a casual manner, is most uncertain and inaccurate. One witness, Byron Parsons, put decedent twenty feet from the track while he was tying his shoe, while most of the other witnesses put him from two to six feet away at that instant. But the question of whether or not Joe Helton was correct in his estimation of distance and time he and decedent traveled together toward the crossing is not so very material. Appellee's witness, Sam Barton, testified he saw them going toward the crossing, and another witness for appellee, Dan Smith, testified decedent stopped at the Durham automobile for a few minutes and Helton went on across. Smith's estimation of time is no better than Helton's because if decedent had stopped at the Durham car for a few minutes, the train would have passed before he reached the crossing, since Helton, who kept on walking, had but little time to spare in getting across ahead of the train.

As there is great contrariety in the evidence as to whether or not the train gave the signals required by Section 786, Kentucky Statutes, for the crossing, we will admit for the sake of argument, these statutory crossing signals were not given which require the ringing of the bell or the blowing of the whistle continuously or alternately, at a distance of at least fifty rods from the place the highway crosses the railroad tracks until the engine has reached the highway crossing. Also, as there is a direct conflict in the testimony as to whether or not the fireman was keeping a lookout (the engineer could not see the crossing from his seat in the cab due to the curve and the engine boiler), we will admit for the sake of argument no lookout was being maintained by the fireman.

Our question now becomes: Was the decedent guilty of contributory negligence as a matter of law? Having eliminated the conflict in the evidence, we determine whether or not decedent was guilty of contributory negligence as a matter of law by ascertaining whether or not men of ordinary judgment might differ as to whether decedent was killed because of his own negligence in stepping in the path of the approaching train, or because of the negligence of those in charge of the train in not giving the required statutory signals, or in keeping the proper lookout, or in operating the train at an excessive rate of speed.

It is not the duty of one approaching a public crossing to stop, look and listen for the train before proceeding to go across the tracks. Illinois Central Railroad Company v. Applegate's Adm'x, 268 Ky. 458, 105 S. W. (2d) 153, and authorities cited therein. The traveler may rely upon the train giving the statutory signals at a public crossing. Louisville & Nashville Railroad Company et al. v. Ratliff's Adm'r, 260 Ky. 380, 85 S. W. (2d) 1006. But when one knows the train is approaching and attempts to beat it to the crossing, as decedent did in this case, the railroad company owes such person no duty to give signals of the approach of the train, as no signals are necessary to apprise a person of that which is already known. Chesapeake & O. Railway Company v. Harrell's Adm'r, 258 Ky. 650, 81 S. W. (2d) 10, and cases cited therein. When a person attempts to go over a public crossing in front of a train he knows to be approaching and is struck by the train, there can be no doubt in the mind of any reasonable person but that his negligence caused, or so contributed, to his death, but for such negligence it would not have occurred, and he cannot rely upon the failure of the railroad company to give statutory signals, since it would constitute antecedent negligence on the part of the railroad. One guilty of contributory negligence cannot base his right of action upon the antecedent acts of negligence of the one causing the injury. Chesapeake & O. Railway Company v. Harrell's Adm'r, 271 Ky. 763, 113 S. W. (2d) 23, second appeal, and cases cited therein; Stull's Adm'x v. Kentucky Traction & Terminal Company, 172 Ky. 650, 189 S. W. 721; Louisville & Nashville Railroad Company v. Hurst's Adm'r, 220 Ky. 402, 295 S. W. 458.

Admitting for the sake of argument appellant was maintaining no lookout and that it was negligent in operating its train at a speed of 70 miles per hour, there can be no recovery on account of decedent's contributory negligence in stepping in front of the train when it was but a few feet from him. This train could not have been stopped in time to prevent its striking decedent, regardless of what rate of speed it was traveling, or how keen, or vigilant, a lookout was maintained. Under such facts the railroad company is not liable even though it were negligent in operating its train, as its antecedent negligence was not the proximate cause of the fatal accident, but the proximate cause of same was

678

decedent's own contributory negligence in stepping suddenly into the path of a fast approaching train when it was right at him. Illinois Central Railroad Company v. Dupree, 138 Ky. 459, 128 S. W. 334, 34 L. R. A., N. S., 645.

Appellee calls attention to the Ratliff Case, supra, and to Cincinnati, N. O. & T. P. Railway Company v. Fox, 269 Ky. 242, 106 S. W. (2d) 973, wherein this court said the law recognized the thoughtlessness of human beings, therefore, it does not require them to stop, look and listen at a public crossing, but puts the duty on the railroad to give warning signals the train is approaching. This rule can have no application in this case where decedent knew the train was approaching and was attempting to beat it over the crossing. In the Fox Case this court said it was the duty of Fox to exercise ordinary care to learn of the train's approach and keep out of its way, yet he had the right to rely upon statutory signals being given and a lookout being kept. But Fox did not know the train was approaching, nor did he attempt to cross directly in front of it after knowing of its approach. In Chesapeake & O. Railway Company v. Bryant's Adm'r, 272 Ky. 339, 114 S. W. (2d) 89, we answered this argument by saying [page 92]:

> "The knowledge of the approach of the train raised the obligation to look for it, and it was negligence not to take some precautions. As those cases demonstrate [referring to cases cited in that opinion], a person may be forgetful in a much shorter time than the decedent here, but they have nevertheless been held guilty of negligence."

In Illinois Central Railroad Company v. Bozarth's Adm'r, 212 Ky. 426, 279 S. W. 636, we wrote [page 637]:

> "Contributory negligence is a complete defense whether it is the sole cause of the injury or not, and it is not necessary that such negligence should be the proximate cause of the injury, but is sufficient if it so contributed thereto that but for such negligence the accident would not have occurred. * * * 'It is true that generally speaking, the question of contributory negligence is one for the jury, but where all the material facts stand confessed, and they show that the plaintiff was guilty of such negligence that the injury would not have otherwise

occurred, then there is nothing to submit to the jury.'"

A peremptory instruction to the jury to find for the appellant should have been given by the trial court at the conclusion of all the evidence. For reasons given herein the judgment is reversed for proceedings consistent with this opinion.