**LOUISVILLE AND NASHVILLE RAILROAD COMPANY et al., Appellants,**

v.

**Mildred M. FISHER, Executrix of the Estate of Marvin J. Fisher, Deceased, Appellee.**

Court of Appeals of Kentucky.

May 18, 1962.

Joseph E. Stopher, A. J. Deindoerfer, Boehl, Stopher, Graves & Deindoerfer, C. Hayden Edwards, W. L. Grubbs, Joseph L. Lenihan, James M. Terry, Louisville, for appellants.

Charles C. McConnell, Raymond C. Stephenson, Louisville, Melvin M. Belli, San Francisco, Cal., for appellee.

CLAY, Commissioner.

Marvin Fisher was killed when one of defendant's freight trains struck the automobile he was driving at a railroad crossing in Jefferson County. A jury awarded his estate $162,121.50. The defendant appeals, contending it was entitled to a directed verdict.

The accident happened in the afternoon. The decedent was proceeding north on a paved two-lane county-maintained public road. There are two tracks at the crossing. A 61-car freight train headed by two diesel engines approached from decedent's right (the east) on the far track at a speed of approximately 45 miles an hour. Decedent was alone in his automobile and no eyewitness observed the actual impact. The front engine struck the automobile squarely broadside and carried it some distance down the track.

The principal controversy developed at the trial and continued here is whether this crossing was *extra-hazardous* because of the alleged presence of tall weeds and/or other vegetation on the right of way. We do not find it necessary to decide that issue because in our opinion, whether or not the crossing was extra-hazardous in this respect, the decedent must be charged with contributory negligence as a matter of law. We will assume without deciding that because of the condition of the crossing and/or the acts of defendant's employees, the jury could properly have found the defendant negligent.

On the question of contributory negligence, the significant factors are (1) the physical conditions at the crossing, (2) the duties of the decedent, and (3) decedent's conduct in the operation of his automobile.

Certain physical conditions are not in dispute. The accident occurred at 4:00 p. m. on a cold, clear, winter day. The road on which Fisher was traveling was straight for several hundred feet, with a slight offset to the left and a rise in the roadway a short distance before the crossing is reached. It intersected the track line, which was straight for a distance of 1700 feet, at a 52-degree angle.

The crossing was marked by two railroad signs, one a standard county yellow circular sign, and the other a "crossbuck" sign (one of the arms of which was missing). In addition, there was an official county STOP sign. It was the type of sign customarily used in the county to designate a boulevard stop and was located to the right of the roadway about 10 feet from the near track. Because of the slight bend of the road to the left just before reaching the crossing, a motorist traveling in the direction of the decedent (on the right side of the road) would run squarely over this sign unless he turned left to go over the crossing.

The only other significant physical characteristic of the crossing affected the visibility a motorist would have of an approaching train. This was violently in dispute, but on the issue under consideration we must accept plaintiff's portrayal. Plaintiff introduced six witnesses concerning this condition.

Mr. Roberts testified in substance that on the day of the accident there were "massive" weeds on the right of way, eight feet tall, which blocked the motorist's view of the tracks to the right of the crossing; and that the front bumper of an automobile "would almost be up to the ties before you could get any vision down the track".

A Mrs. Link testified there were weeds and brush, also eight feet high, on the right of way and that the vision of a motorist was obstructed until "he was almost on the railroad tracks". She said that one could not see a train coming until "practically on the tracks". She could not estimate how far she could see (in feet) if she stopped at the STOP sign above referred to.

A Mrs. Davidson testified about weeds and high bushes, although she was not very specific and the time of her observations was not clear.

Three additional witnesses testified about various types of vegetation which more or less obstructed a motorist's view to the right when approaching from the direction

Fisher approached. These three witnesses were the only ones for the plaintiff who attempted to describe the visibility from the point where the STOP sign was located. Mr. Miller testified that one would have to "get sort of close to the track" to see an approaching train, and he said "I would think so" when asked if one could get a good view to the east when 10 feet from the track. Officer Roehrs testified one could see approximately 140 feet to the right when the STOP sign was reached.

Officer Scannell, who investigated the accident and apparently made a careful study of the physical conditions, testified as follows:

"Q. How close would you have to get to that railroad track, that is, the actual rail itself, before you could see down the tracks?"

"A. Well, if you're driving a police car, we always had to get—your wheels almost had to be on your first track."

In clarifying his testimony on this point he was asked on cross-examination the following questions and made the following answers:

"Q. Now, as you made your investigation there that afternoon on the scene of the accident, did you observe as to whether or not if Mr. Fisher came up here and made a stop at this stop sign that we talked about a moment ago, that red and white sign, he came up there and made a stop, did he or not have good visibility down this track to the east?

"A. Yes, Sir.

"Q. He did?

"A. (Witness nodding head in the affirmative).

"Q. No question about that, is there?

"A. If he's close to that stop sign, yes, Sir."

On this appeal plaintiff has strenuously insisted that Fisher would have been unable to discover the approach of defendant's train if he had stopped at the STOP sign, and that he had no visibility to his right until his automobile actually reached the near rail. The evidence does not establish such facts. However, for the purpose of analyzing our problem, we will indulge an inference most favorable to the plaintiff. We will assume Fisher's visibility to the right was blocked at the point of the STOP sign. However, we will bear in mind that all of plaintiff's witnesses portrayed the obstruction as *open and obvious*. And it is clear from the evidence that the approaching train could have been observed at some indeterminate point between the sign and the near rail.

No contention is or could be made that Fisher was not aware of this crossing or did not observe the warning signs. Nor is it disputed that he was required to exercise due care under the circumstances for his own safety. Our question is whether the only proper conclusion to be drawn from the evidence by fair-minded men is that Fisher failed to exercise such care. (Obviously his negligence, if any, was a contributing proximate cause of the accident.) See Hunt's Admr. v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705. We now turn to the recognized duties of Fisher in the operation of his automobile.

Two extreme cases at opposite poles of the law furnish a starting point for an analysis of the due care required of a motorist at a railroad crossing. These are both older cases and the courts deciding them have since moderated their views. In Louisville & N. R. Co. v. Ratliff's Adm'r, 260 Ky. 380, 85 S.W.2d 1006, the motorist could have observed the approach of the train when he was 360 feet from the crossing. We held the plaintiff was *not* contributorily negligent as a matter of law. This decision appears unsound and certainly has not been followed in the more recent cases of Nash-

ville, C. & St. L. Ry. Co. v. Stagner, 305 Ky. 717, 205 S.W.2d 493; Hunt's Adm'r v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705; Southern Ry. Co. v. Feldhaus, Ky., 261 S.W.2d 308; Louisville & N. R. Co. v. Hines, Ky., 302 S.W.2d 553; Louisville & N. R. Co. v. Troutman, Ky., 351 S.W.2d 516.

At the other extreme is Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645. In that opinion it was stated that if a motorist reaches a crossing and cannot ascertain whether a train is dangerously near, he must not only stop but get out of his vehicle if necessary for that purpose. This burdensome duty was repudiated in Pokora v. Wabash R. Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049. However, the doctrine is still followed in other jurisdictions. See 91 A.L.R. 1057. Unless we follow one of these extremes, our solution lies somewhere between them.

It must be borne in mind that in the foregoing cases there was no special sign or law requiring the motorist to stop. That added factor in this case we will find of controlling significance.

While no distinction appears to have been drawn in the cases between the duties of a *motorist* and those of a *pedestrian* in the exercise of due care at railroad crossings, our decisions involving the latter have consistently recognized a strict code of care. The pedestrian is required to look and listen right up to the time he actually crosses the railroad track, and if he fails to do so, he is guilty of contributory negligence as a matter of law. Louisville & N. R. Co. v. Mitchell's Adm'x, 276 Ky. 67, 124 S.W.2d 1025; Louisville & N. R. Co. v. Brock's Adm'r, 281 Ky. 240, 135 S.W.2d 898; Louisville & Nashville R. Co. v. Mitchell's Adm'x, 285 Ky. 576, 148 S.W.2d 1048; Louisville & N. R. Co. v. Jackson, 286 Ky. 595, 151 S.W.2d 386; Louisville & N. R. Co. v. Lefevers' Adm'x, 288 Ky. 195, 155 S.W.2d 845; Louisville & N. R. Co. v. Hyde, Ky.,

239 S.W.2d 936. In the latter case we said, page 938 S.W.:

"We have never adopted the widely accepted rule that one must stop, look, and listen before going onto a railroad track, but neither have we held that the railroad company is a guarantor of the safety of those who might come in contact with its facilities. Nor have we held that one may close his eyes or reject all audible sounds before he enters upon the facilities. Contrariwise we have held that one must use both his eyes and ears at least to the extent of the ordinarily prudent person in such a situation."

It is apparent from a review of older Kentucky cases that the principle above quoted has not generally been alluded to in cases involving a motorist. Perhaps the ultimate decision in the two types of cases has been subtly influenced by the *mobility* of the person involved in a railroad crossing accident. A pedestrian may at the last minute avoid a collision more readily than a person encased in a motor vehicle.

This differentiating circumstance has led us in some cases (notably Louisville & N. R. Co. v. Ratliff's Adm'r, 260 Ky. 380, 85 S.W.2d 1006) to hold the motorist not strictly accountable when he does not discover the approach of a train until he is very close to the track, on the ground that he is then confronted with an emergency. This line of reasoning is, however, subject to the following criticisms: (1) the "emergency" would not have arisen had the motorist exercised due care before reaching the crossing, (2) the motorist is required by law to have his vehicle under control, (3) a traffic situation the motorist must anticipate should not create an emergency, and (4) the modern motorist is better conditioned and equipped to avoid collisions with competing traffic.

While it is still true that the mobility of the pedestrian and the motorist is not the same, at least three of our more recent cases have tended to equate their duties. In Hunt's Adm'r v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705, we applied to a motorist the same standard of care with respect to looking and listening for a train as was invoked in the pedestrian cases. In Nashville, C. & St. L. Ry. Co. v. Stagner, 305 Ky. 717, 205 S.W.2d 493, in adjudging a motorist contributorily negligent as a matter of law who could have seen the train within 180 feet of the crossing, we called attention to the fact that if he had not observed the train until he was within 10 feet of the crossing he still could and should have avoided the accident.

In Chesapeake & Ohio Railway Company v. Trimble, Ky., 306 S.W.2d 310, the plaintiff stopped his truck 15 or 20 feet from the near track as a train passed over the crossing on the far track. At that point a pump house and standing cars blocked his view of a train approaching on the near track. The driver was held contributorily negligent as a matter of law in failing to discover the train between the point where he stopped and the near track.

The above three cases have effectively overruled or at least limited the authority of Louisville & N. R. Co. v. Ratliff's Adm'r, 260 Ky. 380, 85 S.W.2d 1006; Southern R. Co. v. Lyen, 289 Ky. 726, 160 S.W.2d 1; Illinois Cent. R. Co. v. Applegate's Adm'x, 268 Ky. 458, 105 S.W.2d 153; and Cincinnati, N. O. & T. P. R. Co. v. Hare's Adm'x, 297 Ky. 5, 178 S.W.2d 835.

Plaintiff urges a distinction between cases where the motorist's view is obstructed and where it is unobstructed. This attempted distinction does not aid our analysis of the issue because it does not change the duties of the motorist. An obstruction, be it big or little, near or far, is simply a factor in determining what constitutes reasonable care in the light of that circumstance. As we will discuss later, an obstruction constitutes a warning that more rather than less care must be exercised.

■ Before turning to the evidence of Fisher's conduct at this crossing it is necessary to consider plaintiff's legal theory which he contends necessarily takes this case to the jury. The theory is that Fisher *must be presumed to have exercised due care* at the crossing.

There is direct evidence by one of the defendant's trainmen that Fisher's automobile was seen by him when it was approximately 130 feet from the crossing proceeding at a speed of about 45 miles per hour, and that it moved onto the crossing without slackening speed. Plaintiff attacks the credibility of this witness and even though it appears a reasonable explanation of the accident, we will ignore it. Plaintiff insists that in the absence of *direct* evidence of Fisher's conduct, we must presume he exercised due care. This theory of course would foreclose our consideration of the significant circumstantial evidence. Such a proposition is demonstrably unsound.

This particular "presumption" theory seems to have originated in insurance cases where the question was whether a person had died by his own hand. It has been said there is a presumption a person did not commit suicide, which is nothing more or less than saying that if the insurance company, having the burden of proof, does not show how the insured came to his death, it has failed to establish its defense. Sovereign Camp W. O. W. v. Valentine, 173 Ky. 182, 190 S.W. 713.

This general idea has occasionally crept into railroad and other traffic accident cases. In Cox's Adm'r v. Cincinnati N. O. & T. P. Ry. Co., 238 Ky. 312, 37 S.W.2d 859, 862, it was said that *negligence will never be presumed* since the burden of proving contributory negligence is on the defendant, which of course is sound. The rule was restated with its essential qualification in Owen Motor Freight Lines v. Russell's Adm'r, 260 Ky. 795, 86 S.W.2d 708, 714, as follows:

"The rule in such case is that where there is *no evidence, direct or circum-* *stantial,* of conduct of the injured party, indicium of his negligence, there is in death cases *a presumption of due care on his part.*" (Our emphasis.)

In Illinois Cent. R. Co. v. Applegate's Adm'x, 268 Ky. 458, 105 S.W.2d 153, 158, and Cincinnati N. O. & T. P. Ry. Co. v. Hare's Adm'x, 297 Ky. 5, 178 S.W.2d 835, 838, the so-called presumption was apparently invoked, each of the opinions reiterating its applicability where "there was no evidence to the contrary". Strangely, in both of these cases there *was* evidence to the contrary so that the actual decisions were not governed by the rule. We have already in this opinion questioned the soundness of these two cases and to the extent they incorrectly apply this legal theory both cases must be overruled. (In Iowa where the burden is on the plaintiff to prove freedom from contributory negligence, there is a counterbalancing presumption of due care when there is no eyewitness. See Mast. v. Illinois Cent. R. Co., D.C., 79 F.Supp. 149, affirmed 8 Cir., 176 F.2d 157.)

It is difficult to find much utility in the proposition that *in the absence of any evidence,* direct or circumstantial, a person will not be presumed negligent (or contributorily negligent), or conversely, will be deemed to have exercised due care. No one would question this self-evident truth. It is simply another way of stating (which is likewise axiomatic) that if the party with the burden of proof fails to produce *any* evidence he does not win. However, if there *is* proof, the so-called presumption, by its very terms, vaporizes. (In the res ipsa loquitur cases circumstantial evidence alone is sufficient to create a very real and opposite presumption that a party *was* negligent. See Knop v. Atcher, Ky., 308 S.W.2d 287.)

In the final analysis a "presumption" that a person is not negligent is of no assistance in the solution of the problem before us. If there was *no evidence* Fisher failed to exercise due care for his own safety, then a

jury could not properly find, much less could we determine as a matter of law, that he was guilty of contributory negligence. On the other hand, defendant's contention is that even if we disregard the direct testimony of its employee (who said he saw the decedent approach the crossing without slackening speed), the circumstantial evidence unerringly establishes that Fisher failed to exercise any care at the crossing. We will briefly review that evidence.

It was broad daylight and general visibility was good. The evidence was uncontradicted that the bell on the engine was ringing before the train reached the crossing. The only witness to testify for the plaintiff about the signals stated he heard not only the bell and the whistle but the train itself when he was a half a block away from the crossing.

The nature of the collision indicates that Fisher had not changed his course-line over the track since his automobile was struck broadside by the train. The inference must be either that he was unaware of the train's approach or was trying to beat it across. (There is no reason to infer he was attempting suicide.) There was no evidence of tire marks to suggest he made any mechanical effort to avoid the collision.

That the crossing was well marked, there can be no dispute. Since Fisher lived within half a mile of it, he must have been generally familiar with the railroad line passing through this vicinity. (At the trial neither party seemed inclined to develop Fisher's familiarity or unfamiliarity with this particular crossing, but it does appear he had been over it at least once.) In spite of the warnings Fisher drove his automobile directly into the path of the train. In the recent case of Louisville & N. R. Co. v. Troutman, Ky., 351 S.W.2d 516, 519, we said:

"It is unquestioned that a railroad crossing is in itself a warning of danger and that a traveler having knowledge of its existence must exercise care for his own safety in such a degree as is proportionate to the danger then present or apparent of being struck by a train. Nashville C. & St. L. Railway Co. v. Stagner, 305 Ky. 717, 205 S.W.2d 493; L. & N. R. Co. v. Hyde, Ky., 239 S.W.2d 936. If he knows, or in the exercise of reasonable care and prudence must have known, of a train approaching by using his senses of sight and hearing in a way that an ordinarily prudent person would do under similar circumstances, and drives his automobile in front of the train, he assumes the risk of crossing in safety. If he miscalculates and is injured, he is guilty of contributory negligence."

Plaintiff's theory is that even though Fisher was amply warned of the railroad crossing, the defendant had blocked his visibility of the approaching train and this somehow relieved him of a duty to continue to exercise due care. If Fisher was confronted with an extraordinary hazard which was not obvious and about which he had not been given an adequate warning, a theory of entrapment might justify plaintiff's position. The stark fact is, however, that this additional hazard was open and obvious (being readily apparent to all of plaintiff's witnesses). Perhaps most important is the fact that counterbalancing the extra-hazard was the extra-warning to Fisher in the form of the STOP sign, to which we have referred.

It seems clear the decedent pursued one of two courses. He either ignored the STOP sign and proceeded over the crossing without heeding its warning or he stopped (or slowed his vehicle sufficiently), before reaching the track, to appraise the hazard of proceeding further. If he pursued the first course and completely ignored the STOP sign and the other warnings of the crossing, he must be held negligent as a matter of law. On the other hand, if he did stop or even slowed his vehicle sufficiently to prepare for the obvious crossing hazard (plaintiff would have us presume he

actually stopped), then reasonable minds must conclude that he did not exercise due care thereafter when he failed to see or hear the approaching train.

■ This is the first case we have had involving an *official highway* STOP sign at a railroad crossing. (It is not the type of sign designated by KRS 189.560(3).) KRS 189.231(2) provides that the driver of a vehicle shall obey the instructions of an official traffic control device. The fact that the sign is located at a railroad crossing rather than a highway intersection does not impair its efficacy as a warning device, particularly since a railroad crossing confronts the motorist with the same type of hazard (though in some respects even more hazardous than an intersecting highway). In North Carolina the words "intersecting highway" in a statute fixing the duties of the operator of a motor vehicle were construed to include a railroad crossing. Hinton v. Southern Ry. Co., 172 N.C. 587, 90 S.E. 756. As a matter of fact, it is clear the reason the county engineer placed this STOP sign at this point was to furnish the same warning as is given at the intersection of a boulevard or through highway thoroughfare.

■ Even in the absence of KRS 189.-231(2), in the modern day of motoring, an official highway STOP sign is a well understood monitor of traffic control and its meaning must be known to anyone competent to drive. Wherever located, its urgent warning cannot be ignored. Its message to the motorist is to stop *for the purpose of analyzing the traffic conditions and possible hazards immediately ahead.* Romans v. Duke, 313 Ky. 157, 230 S.W.2d 439.

■ In our opinion no reasonably prudent motorist may justifiably ignore the warning of such a STOP sign on a highway. To do so is to engage in a form of Russian roulette. If Fisher did so, he was negligent as a matter of law. The reasoning in the highway intersection cases is clearly applicable here. See Romans v.

Duke, 313 Ky. 157, 230 S.W.2d 439; Yates v. Kurtz, 314 Ky. 867, 238 S.W.2d 669; Manning v. Claxon's Ex'x, Ky., 283 S.W.2d 704.

Our only other plausible hypothesis is that Fisher complied with the law and the dictates of common sense and did heed this warning of a special hazard. (Plaintiff says we must presume he did so.) If he pursued this course, then his subsequent conduct can only be explained as complete carelessness. If he did stop (or even slowed his vehicle sufficiently so that he could stop before going onto the track), he performed only the initial step of due care. Stopping in itself is entirely ineffective unless the motorist thereafter uses his faculties to ascertain the hazard of proceeding further.

In an earlier day, before the development of modern traffic patterns and traffic controls, it was held by this Court that there was no duty upon a traveler on the highway to stop, look and listen at railroad crossings. Louisville & N. R. Co. v. Ueltschi's Ex'rs, 29 K.L.R. 1136, 97 S.W. 14. Since that time, because of the increase in the number and kinds of highways and the vast increase in vehicular traffic, all motor vehicle driving has become more hazardous and the motorist must constantly be prepared to yield the right of way. It would be a curious turn in the law if the motorist, who has certain known duties to perform on reaching a STOP sign marking a through highway thoroughfare, would have lesser duties when confronted with the same sign at a railroad crossing, which is potentially a much more dangerous intersection. The sign is placed at both locations for identically the same purpose, and it constitutes a clear warning to take extra precautions before proceeding further.

■ Our more modern view is exemplified in Hunt's Adm'r v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705, 709. Therein we said:

"We have never held in a suit against a railroad resulting from an accident

which occurred at a crossing that the plaintiff must first show he had stopped, looked and listened before he drove upon the track, in order to recover, but we have held in a great many cases, some of which have been cited herein, that where the injured party fails to look and listen under circumstances where an ordinarily prudent man would look and listen, such person will be guilty of contributory negligence as a matter of law."

█ In the present case the STOP sign itself is a significant circumstance impelling a reasonably prudent man to look and listen. Having obeyed the directions of the sign and taken cognizance of its warning, the motorist must exercise ordinary care in the use of his faculties *to discover the hazard* about which he has been cautioned. Even when a plaintiff testified positively that he took precautions, we have held him guilty of contributory negligence as a matter of law if, with a clear opportunity to do so, he did not hear or see an approaching train. McCarter v. Louisville & Nashville R. Co., 314 Ky. 697, 236 S.W. 2d 933; Chesapeake & Ohio Railway Company v. Trimble, Ky., 306 S.W.2d 310. Surely under similar circumstances an inference of careful conduct, totally unsupported by any proof, could not be drawn. See Louisville & N. R. Co. v. Hyde, Ky., 239 S.W.2d 936, and Louisville & Nashville Railroad Company v. Hines, Ky., 302 S.W. 2d 553.

Having outlined the framework of the law which generally governs crossing cases, we now address ourselves to the special features of this accident. The basic contention of the plaintiff is that because defendant negligently permitted vegetation to grow on the right of way, Fisher's view of the approaching train was blocked even beyond the point of the STOP sign, and this would justify a jury in allowing recovery. In essence this argument must be that defendant's negligence absolved Fisher from exercising due care in discovering the

approach of the train. While this proposition may constitute a good argument for a doctrine of comparative negligence (which in a case of this kind might well accomplish the most just result), it does not conform with rational conduct or settled legal principles.

Let us put our theoretical "reasonable man" in the place of the motorist Fisher and assume he had, in obedience to the mandate of the sign and in recognition of the nature of its warning, brought his automobile to a stop in the vicinity of the sign. Whether or not he would be startled at finding a barrier of massive weeds eight feet tall in February in Kentucky, he must certainly have recognized the obvious special hazard which plaintiff so diligently developed. At the point of the STOP sign he observes no threat from his left in the form of a train approaching on the near track. Obviously the only hazard is the possibility of a train approaching on the far track to his right.

Plaintiff insists that his view in that direction is blocked. Would the ordinarily prudent person under these conditions abandon all precaution and assume he had a clear field (which he knows he hasn't) or would he drive forward to a point where he could determine whether he was endangered by an approaching train? Every motorist has been confronted with situations at boulevard stops where his vision from the point of the STOP sign, or even the intersecting line of the thoroughfare, is obscured. No one could say that this gives the motorist a license to charge blindly into the intersection. The precise warning of a STOP sign is to exercise extra care before venturing into the line of crossing traffic.

█ The fallacy in plaintiff's position is that a motorist has exhausted his duty to exercise care upon *reaching* a STOP sign. This could not be true from the standpoint of common sense, rational conduct, or the law. See Bolam v. Louisville & N. R. Co., 6 Cir., 295 F.2d 809. (STOP sign on

city street crossed by railroad track—Kentucky law applied.) Surely if a motorist's view is obstructed when he stops at a STOP sign, he is under a duty to proceed with caution until he can discover the particular hazard the sign warns him to expect. Segreto v. American Automobile Ins. Co., D.C., 137 F.Supp. 194. That opinion states (page 196):

> "If the plaintiff is correct in stating that he stopped for the stop sign on Dumaine at Dauphine, then he was negligent in proceeding into the intersection directly in the path of the Lanaux car. It is no answer to say that the blind corner blocked his vision when stopped at the stop sign. Plaintiff was under a duty to proceed on Dumaine Street to a point where he could see to his right of Dauphine to determine whether the way was clear for him to proceed across the intersection."

In Anderson v. Morgan City Canning Co., La.App., 73 So.2d 196, it was held that a person who merely stops before entering a right of way thoroughfare has only performed one half of the duty resting upon him, and that it is "negligence of a gross character" to proceed further without ascertaining if it is safe to do so.

The three cases just cited involved street intersections but we can discover no reason why the same principles of prudent conduct should not apply in like circumstances at a railroad crossing.

The extra-hazardous condition upon which plaintiff pins his case is the very condition which the motorist must observe and can neutralize if he obeys the literal warning of the sign and arrests his progress. Stopping puts him in a position of *mobility*, which we have heretofore discussed in connection with the duties of a pedestrian. Warned by the sign and con-

fronted with an unseen but predictable peril on his right, a reasonably prudent person would certainly take extra precautions to discover his danger. The circumstance of obscured vision imposed on Fisher more rather than less care. Louisville & N. R. Co. v. Howser's Adm'r, 201 Ky. 548, 257 S.W. 1010, 36 A.L.R. 327; Nashville C. & St. L. Ry. Co. v. Stagner, 305 Ky. 717, 205 S.W.2d 493; Layman v. Chesapeake & O. Ry. Co., Ky., 266 S.W.2d 111; Chesapeake & Ohio Railway Company v. Trimble, Ky., 306 S.W.2d 310.

If the decedent actually stopped in obedience to the STOP sign, his conduct thereafter is simply inexplicable in terms of due care. It is so inexplicable on this assumption that the assumption itself strains our reason. Even without accepting the testimony of defendant's trainman, the only plausible explanation of this accident is that Fisher did not stop, or look, or listen. But if he did stop, the only reasonable inference that can be drawn from the evidence is that he failed to exercise any care for his own safety by either looking or listening. (Though we have emphasized the apparent reason decedent did not *see* the train, the failure to *hear* it is likewise unexplainable except in terms of negligence.)

All of the evidence points unerringly to a lack of due care on the part of Fisher. There is not a scintilla which points the other way. Unless it is due care to exercise no care to either see or hear at a railroad crossing, a jury could not justifiably find for the plaintiff. We are of the opinion plaintiff's decedent was contributorily negligent as a matter of law.

We have not undertaken to decide any other issue raised on this appeal.

The judgment is reversed with directions to enter a judgment for the defendant under CR 50.02.